## Overman's Appeal.   Richardson's Estate.

1 The testator directed that the income to be paid to his children should be paid, " in such way and manner that the same shall be free from the control, contracts, debts, liabilities or engagements of any of my said children," and appointed his son one of his executors.   Upon the filing of their account, the executors were surcharged in such an amount that the interest thereon would exceed the son's share of the income.   *Held*, that the son was entitled to receive his full share of the income from the remainder of the estate.

2. Under such a trust no distinction exists between a liability to the estate and a liability to a stranger.

May 8th 1878.    Before AGNEW, C. J., MERCUR, GORDON, PAXSON, WOODWARD and TRUNKEY, JJ.   SHARSWOOD, J., absent.   .

[1] See Harrison et al. *v.* Collins, 5 Norris 153, and Lehigh Valley Coal Co. *v.* Jones, Id. 432, for a further discussion of the questions involved in this case.—REP.

[Overman's Appeal.]

Appeal from the Orphans' Court of *Philadelphia county :* Of January Term 1878, No. 91. Certified from the Eastern District.

Appeal of Mary B. Overman from the decree of the court dismissing her exceptions to the report of the auditor to whom was referred the accounts of the surviving executors of William Richardson, deceased.

William Richardson died in 1866, leaving a will, of which the following are the material clauses :

Item Ninth.—The said income so directed to be paid by my said executors shall be paid to my said children and grandchild, in such way and manner that the same shall be free from the control, contracts, debts, liabilities or engagements of either or any of my said children or grandchild, or the debts, liabilities or engagements of either of the husbands of my said daughters.

Item Tenth.—It is my will, and I do hereby direct, that my executors hereinafter named, and the trustees of any portion of my estate, shall not be personally liable or responsible for any moneys, except such as shall be actually received by them individually ; nor shall either of them be responsible or liable for the acts of their co-executors or co-trustees to which they do not consent, but each of them liable for their own individual acts and deeds, and for such moneys as shall come into their hands.

The eleventh clause of the will authorized the executors to make partition of lands in Schuylkill and other counties ; to purchase the moieties or interests of co-tenants, and to raise the means of purchase by mortgage or otherwise on the lands ; and, if deemed expedient in their opinion, to create a joint-stock company to manage the lands ; or "in any way or manner to take action with regard to them" which they should " deem to be manifestly to the interest of the estate."

Of the five appointed, the three surviving and acting executors, being George J. Richardson, a son of the testator, and one of the annuitants under the will, and two sons-in-law, filed several accounts, all of which were referred to Charles Gilpin, Esq., as auditor. After a protracted series of meetings, the auditor found, in an amended report, that the executors had unlawfully loaned to the firm of Lucas & Co. the sum of $271,759.40, which, owing to the insolvency of that firm, was totally lost : that such books of accounts as had been kept, were claimed to have been lost or mislaid ; that further difficulty was offered to the investigation by the prolonged absence of George J. Richardson in North Carolina, on business of his own ; " that after Lucas & Co. became embarrassed and loans were made to them, the business of the estate was loosely and carelessly managed by the accountants. Harmony did not prevail between them at all times. Sometimes two acted for the three, and at other times the money affairs were largely under the control of one of them, George J. Richardson. It is impossible to say how far the moneys

of the estate were mixed with his own, as there were no regular books of the estate or his own to enable any one to decide that question.

"Your auditor is of opinion that all three are equally blameable for acts of commission and omission, which should not be tolerated in trustees. He does not mean to charge any one of them with taking and using the funds of the estate. He assumes, in the absence of evidence, that they acted honestly in this respect; but he does say and decide, that trustees who act so inharmoniously and carelessly, and by want of proper care of the trust fund cause such losses to the estate, cannot be considered as having earned commissions. * * *"

The auditor found an over-payment to the life-interest of income, or what was supposed by them to be income, and surcharged them with the sum of $579,120.44.

At this stage of the proceedings, the Philadelphia Life, Trust and Insurance Company was appointed executor, and their account was referred to the same auditor. Thereupon, Mary B. Overman, one of the annuitants, claimed the right to have sequestrated in the hands of the accountant the income of George J. Richardson, to meet over-payments of the income or any other indebtedness to the estate incurred by him. The auditor, deciding against this claim, held that: " The case of George J. Richardson, one of the annuitants or life interests, presents features not found in the cases of the other children and grandchild. He was co-executor and trustee, first, with four others, and afterwards with two others. It was contended that neither the trust nor the law applicable to voluntary payments protected him. It was argued that the trust did not protect him, because he was payee with others and receiver himself, and overpaid himself, and became otherwise largely indebted to the estate. There is, in the opinion of your auditor, a full answer to this line of argument.

" The trust is, within the authorities in Pennsylvania, what is called a *spendthrift trust:* Fisher *v.* Taylor, 2 Rawle 33 ; Holdship *v.* Patterson, 7 Watts 547 ; Rees *v.* Livingston, 5 Wright 113 ; Ashhurst *v.* Given, 5 W. & S. 323 ; Vaux *v.* Parke, 7 Id. 19 ; Rife *v.* Geyer, 9 P. F. Smith 393 ; Keyser *v.* Mitchell, 17 Id. 473.

" This trust is sustained by these authorities. The trust is good against all strangers to the estate. It was not contended that it was not good against all strangers, and the authorities fully sustain this view. If so, why not good against a debt due to the estate or to other life-interests or parties in remainder ?

" He was not indebted to the testator or his estate at the death ; the trust was created by the testator ; after his death the indebtedness to the estate originated ; how can this new debt rise any higher, occupy any higher plane for any purpose, than any old or new debt of George J. Richardson, as to its effect on the trust created by the

testator ?   The opportunity was afforded to incur a debt to the estate, and whether this was foreseen or unexpected by the testator it gave no power to the debt to the estate, greater than any other debt, to impugn and overthrow the trust.

"Your auditor is, therefore, of the opinion that the income of George J. Richardson in the hands of the present trustee cannot be sequestrated to meet over-payments to income or any other indebtedness to the estate incurred by him, and so decides.

"He therefore decides that all income received and receivable by the new trustee is payable to and divisible among the annuitants named in the will in the proportion therein specified."

The Orphans' Court dismissed the exceptions to this ruling, whereupon Mrs. Overman took this appeal, assigning for error the action of the court in sustaining the decision of the auditor on her claim.

*E. Spencer Miller* (with whom was *P. F. Rothermel*), for the appellant.—An executor or administrator, who owed a debt to his testator, or intestate in his lifetime, and omits to pay it, is surcharged with it on settlement of his account as if it had been collected : Bull's Appeal, 12 Harris 286.

It would follow that if a legacy or distributive share be payable to him he will be treated as having collected the debt from himself and therewith paid his own legacy or distributive share, if it become necessary to adopt that theory to do justice, as in a case where the executor was insolvent, and what remained of the estate was only enough for others.

A court of equity will treat the debt of the trustees as producing income as against George J. Richardson.   By not paying the interest upon it to the estate he merely anticipates his own share of the income.   Had Mr. Richardson needed and been allowed an anticipation of his income, it could be regarded only as a debt to the estate, and would have been subsequently equalized.   Had he taken and spent commissions to which he was not entitled, he certainly could be charged with them as against any income coming to him. Unless the claim in this case be allowed, an avenue will be opened to the grossest fraud in the management of such trusts.

*Samuel Dickson* (with whom was *J. C. Bullitt*), for the appellee. —The directions of the will would make the trust an active one, without more (Earp's Appeal, 25 P. F. Smith 119); but it goes further than this, and the language used is that ordinarily selected in creating "a spendthrift-son-trust."   The law upon this subject has become a rule of property, and can only now be changed by the legislature.   From Fisher *v.* Taylor, 2 Rawle 33, down to Keyser *v.* Mitchell, 17 P. F. Smith 473, there has been no break in the current.   The result of the cases is to make the beneficiary, though *sui juris* as to his own property, incapable of binding himself by

[Overman's Appeal.]

contract, or becoming bound by acquiescence or estoppel in respect
to the property held for his benefit.    This is not by way of main-
taining his rights, but in order to protect the property and to pre-
serve the bounty of the donor.    In the extreme case of Ashhurst *v.*
Given, 5 W. & S. 323, where the cestui que trust was his own trus-
tee, Mr. Justice KENNEDY said : " Whoever has the right to give
has the right to dispose of the same as he pleases.    *Cujus est dare
ejus est disponere,* is the maxim which governs in such cases." It
is not the right or ownership or title of the beneficiary which is con-
sidered, but the very object of the rule is to protect the improvident,
the reckless, the unfortunate, or the dishonest, against his own folly
or crime, so as to insure him and his family a support in spite of
any attempt by way of anticipation or contract or assignment to take
his own bread and butter out of his own mouth.    In short, the ces-
tui que trust must be treated as to the trust estate as one under dis-
ability, like an infant or married woman, and incapable of impairing
the provisions made for him in any way, or the purpose of the donor
must be defeated.    The contest has always before arisen with meri-
torious creditors, deceived by the apparent possession of means, and
having every claim to the consideration of the court.

Looking, indeed, at the whole will, and seeking to discover the
intent of the testator in respect to a question of this character, it
must be apparent that any purpose on his part to make such dis-
crimination in favor of his estate, would be wholly repugnant to the
general scope and intent of this instrument.    When, then, the tes-
tator has declared that he considers the maintenance of the object
of his bounty of greater importance than the discharge of any obli-
gation he may incur to strangers, it is incredible that he should not
also have intended to exempt him from obligations incurred to his
estate, and it is very doubtful if the policy of the law would permit
a trust of the kind to be created, which should be good as against
general creditors, but invalid as against other members of the testa-
tor's family.

Chief Justice AGNEW delivered the opinion of the court, June
24th 1878.

We must take the facts of this case as found by the auditor.
They exhibit a *devastavit* by George J. Richardson, one of the exec-
utors and trustees, of a gross kind.    Want of harmony in the execu-
tion of the trust, loose and careless management, failure to keep
proper accounts of their doings, great delay, absence from the trust,
improvident loans of very large sums of money, and gross misman-
agement, seem to have characterized their transactions.    It is upon
such a case, the question arises, whether under the will of William
Richardson, his father, George J. Richardson, one of the trustees,
guilty of this gross mismanagement, is entitled, as a legatee, to his
portion of the income set apart to himself and the other children

[Overman's Appeal.]

of the testator; or whether it or so much as is necessary, should be retained to answer the portions of his co-legatees. It was held in the court below that he was entitled to his share of the income, notwithstanding his *devastavit*, on the ground that the trust for him and them was a spendthrift trust. This was a mistake resulting from two errors—one, giving to such a trust, a scope unsupported by equity, the other overlooking the plain intent of the testator.

That a trust for a spendthrift, as it is termed, will be upheld in equity, is a settled doctrine of this state, and rests on the donor's right of dominion over his own property for a reasonable time. But it is exceptionable in its very nature, because it contravenes that general policy, which forbids restraints on alienation and the non-payment of honest debts. In order to support it, resort is had to a *trust*, which equity will enforce, and equity necessarily regards its reasonableness and the clearly-defined intent of the donor. Without such a trust upheld in equity, title in the devisee or legatee claims to itself control and liability to creditors. As this is a trust resting in equity, it is clear that equity will support it only so long as it rests on the well-defined intention of the donor. When that is gone, the trust falls with the loss of this, the only true basis. A trust to pay income for life may last for the longest period of human existence, and may run for seventy or eighty years. While the law simply tolerates such a trust, it cannot approve of it as contributing to the general public interest. Property tied up for half a century contributes nothing to the general wealth, while it is a great stretch of liberality to the ownership of it to suffer it to remain in this anomalous state for so many years after its owner has left it behind him. Clearly it is against public interest that the property of an after generation shall be controlled by the deed of a former *qu. dead?* period, or that the non-payment of debts should be encouraged.

The argument of the appellee attributes to a spendthrift trust an inviolability, which transcends all proper notions of equity, in holding that a trustee, because he is also a legatee of a single share, shall be exempt from that valuable rule of equity, which requires a strict performance of duty as essential to the interest of his trust. Indeed, it is a rule of morality as well. Besides, it elevates a single special intent of the testator above the general interests of his estate, and subordinates the welfare of others, equal objects of his bounty to that of the faithless trustee, the object of the single intent. On what principle of equity, which guards this trust for others as well as for him, shall the control of the fund by the defaulting trustee enable him to enjoy his own portion at their expense without accountability? Shall five others go a-begging to enable him to enjoy that which the testator gave him, free from creditors only *when it accrues* to him, as we shall see was the special intent of the testator? There is neither good law nor sound morals in such a proposition.

The express will of the testator in this instance coincides with the general intent. Two things of equal strength are declared in the tenth item. 1st. That the executors or trustees shall not be liable for each other, or one for money received by the other. 2d. But each shall be liable only for his own individual acts and deeds, and for such moneys as shall come into his hands. After this declaration, can it be doubted that the testator intended that each should be liable for his own breach of trust? If not, on what principle can it be held he meant that his liability should be less than the loss he has caused? His portion is a part of the estate, and how shall it be exempt from a *devastavit*, which affects the portions of others equally the objects of the testator's bounty, and who have no part in the fault which causes the loss? If the *whole* estate is lost by the fault of the trustee, what becomes of his own portion? It is gone with that of the others, and that is the result of the act of the testator, who made him a trustee for himself as well as others. Now, did the testator, in thus clothing him with a power over his whole estate, intend he should not be responsible to any one? If, as trustee, he shall have spent it for his individual use and thus had its benefit, because of his control as trustee, can it be said that the testator meant that he should enjoy his own wholly, while the others should get nothing? The will itself distinguishes between the trustees and the legatees in the very clause conferring protection over the shares given to the latter. Item 9th: "The said income so directed to be *paid* by my said *executors*, *shall be paid* to my said *children and grandchild*, in such way and manner that the same shall be free from the control, contracts, debts, liabilities or engagements of either or any of my said children or grandchild," &c. Thus the trustees are to secure the payment to the legatees in such way that neither creditors nor they shall control the testator's bounty. Thus it is the thing paid or ready to be paid over, which is to be protected, and it is the trustee who must perform the duty of protection when he pays over and the protection is to be against others. The will presupposes that the executor has performed his duty and is ready to pay over the legacy. Then comes in the idea of protection against creditors and the legatee himself. But what warrant of intention on the part of the testator is there that this protection is to be carried backward to protect the trustee who fails to produce the legacy? Clearly he stands before, and if he fails to produce the things to be protected, he must answer for it both in equity and according to the intent of this testator. If the trustee, having it in his own hands, has squandered his own legacy, it is gone; if that of others, his own must share in the loss, if partial, or make it up if entire. Neither reason nor the intent of the testator relieves it from the effect of a *devastavit*. But if the trustee may squander the shares of others and yet save his own, it will carry the doctrine of a spendthrift trust beyond all our notions of equity

and honesty, and fasten upon the testator a special intent in favor of a faithless trustee, and in violation of the same protection he intends for the benefit of the other objects of his bounty. This is unjust. The decree of the Orphans' Court is therefore reversed, and the record ordered to be remitted to carry out the views expressed in the foregoing opinion

SHARSWOOD, MERCUR and PAXSON, JJ., dissented.

The court, on motion, ordered a re-argument before a full bench.

On the re-argument at Philadelphia on January 8th 1879, before a full bench, *S. Dickson* submitted the following additional brief:—

The limitation in the opinion of the Chief Justice of the scope of a spendthrift-trust would destroy such trusts altogether, and neither the ninth nor tenth item expresses a general intent with sufficient clearness to override the special intent of the other. The will, like any other writing, must, if possible, be so construed as to give effect to every part. The ninth section makes no distinction in terms between debts to the estate and to third persons, and the tenth section relates to all five executors, of whom only one was a beneficiary, and clearly they were intended to respond out of their own estates. To infer that the fifth was to be held answerable in the same way and in that only, satisfies the language used and harmonizes both clauses.

The tenth section is intended to limit and restrict responsibility and not to enlarge it; and confessedly, had it not been inserted, the share could not have been withheld. Why should a clause inserted for his exoneration from liability for the acts of his co-trustee, be taken to import an intention to destroy a provision for his maintenance which otherwise would have been left secure? It does not create any other liability than such as the law would create without it. It does not even impose a responsibility in terms. It only confines that of each to his own acts.

Under the facts as found in this case, George J. Richardson is not responsible because of the tenth section. Had it been omitted, his liability to the estate would have been what it is now—neither more nor less. If the ninth section, therefore, is to be nullified, it cannot be done but by the help of the tenth section, because that not only does not give rise to any new or peculiar liability, but it cannot be made the foundation of any liability whatever except by implication. All contracts, debts, liabilities or engagements are embraced in the ninth section; a surcharge under the tenth section is still only a debt or liability; therefore it is included in the ninth section.

Though the rule as to the general intent overruling the particular intent is still recognised (Sheetz's Appeal, 1 Norris 213; Jenkins

*v.* Hughes, 8 H. L. C. 571), no attempt is made in any case to define precisely what they mean, nor any rule given whereby it may be determined, in the special case, which is the general and which the particular intent; and Lord Denman observes that the doctrine " has been justly objected to, of late, as incorrect and vague, and likely to lead to erroneous results :" Doe *v.* Gallini, 5 B. & Ad. 621 (27 E. C. L. R. 138); see also 2 Jarman on Wills, 400–407. If it means anything it must mean the principal purpose of the will,— that to which the testator attached the greatest importance,—and if so, the chief end this testator had in view was to secure to all of his children, including the appellee, a sure income for life ; while the tenth section is only " the given formula of city scriveners :" Williams's Appeal, 2 Norris 388. No new exception should be engrafted upon a system like that of spendthrift-trusts, which is peculiar to Pennsylvania and itself an exception.

On May 5th 1879, Mr. Justice WOODWARD delivered the following opinion :

Notwithstanding the fact stated by the auditor in his first report that one hundred and thirty-three meetings were held before him, and the fact that in the final decree surcharges were made against the trustees under Mr. Richardson's will, amounting to the sum of $579,000, only a single point is in issue in this appeal. That is raised by the assignments of error in which the appellant complains that her exceptions to the report were overruled by the Orphans' Court. The first of these exceptions covers the whole field of this controversy. It was in these words : " She excepts because said auditor has reported in effect that George J. Richardson is entitled to receive from time to time, equally or rateably with the other children of said William Richardson, deceased, a full share of the income of said estate from the said trustees."

By the ninth section of the will of Mr. Richardson, the residue of his estate was vested in his executors in trust, to collect and pay over the income to his wife, children, and a grandchild, during their lives. This provision was made in the concluding clause of the section : " The said income so directed to be paid by my executors shall be paid to my said children and grandchild in such way and manner that the same shall be free from the control, contracts, liabilities or engagements of either or any of my said children or grandchild, or debts, liabilities or engagements of either of the husbands of my said daughters." Five gentlemen, including George J. Richardson, his son and two of his sons-in-law, were appointed executors and trustees, no one of whom, it was directed by the tenth section of the will, should be liable for any moneys received or any acts done by either or any of his co-executors or co-trustees, but only for moneys received or acts done by himself. After the first account was confirmed, Mr. Sparks, one of the trustees, resigned, and Mr.

Smethurst, another of them, died, and the estate was thenceforth left under the management of the testator's son and sons-in-law.

Mr. Richardson died on the 24th of January 1866, and soon afterwards the trustees undertook the development and improvement of the coal lands belonging to the estate in the county of Schuylkill. A lease was made to John Lucas & Co., and the advances made to the lessees by the trustees began about the 25th of March 1867, and were continued until they amounted to $271,759.40, with which sum the trustees were surcharged by the auditor. The enterprise was ruinous from the outset. Lucas & Co. finally failed. The report found that the trustees " had no power under the will to make such loans," and that no law existed " to sustain such use of trust funds." It found also that " after Lucas & Co. became embarrassed and loans were made to them, the business of the estate was loosely and carelessly managed by the accountants; that sometimes two acted for the three, and at other times the money affairs were largely under the control of George J. Richardson," and that it was " impossible to say how far the moneys of the estate were mixed with his own, as there were no regular books of the estate or his own to enable any one to decide that question."

Under these facts, it has been strongly urged on behalf of the appellant, that the right of George J. Richardson to receive his share of the current and prospective income of the estate has become forfeit. The allegation was that he joined with the other trustees in a negligent or fraudulent waste of a sum, the interest on which would largely exceed the income of what remained.

The argument was pressed with some feeling and much force. Analogies that were more or less apt were suggested. But analogies are as likely to misguide as to guide safely. Just the facts as they stand in this record are to be fairly met. The auditor said that while there had been carelessness, mismanagement and mistake on the part of the trustees, he did " not mean to charge any of them with taking and using the funds of the estate," and he assumed in the absence of evidence that they acted honestly in this respect, and disastrous as the results of the effort to develop the Schuylkill lands proved to be, the general powers conferred by the will on the trustees were very large. By the eleventh section they were authorized to make partition of lands in Schuylkill or other counties, to purchase the moieties or interest of co-tenants, and to raise the means of purchase by mortgage or otherwise on the lands. They were authorized also, if expedient in their opinion, to create a joint-stock company to manage the lands, " or in any way or manner to take action with regard to them" which they should " deem to be manifestly to the interest" of the estate. Under a charter so broad as this they entered into the Lucas lease and made advance after advance, upon assurances of certain and near success that are always given, and with the glowing hopes and firm faith which often unhinge or cloud

the judgment of very prudent men when they are searching for sources of wealth that are hidden in the earth. Besides, the income to be paid to George J. Richardson was to be free from his own " control, contracts, debts, liabilities or engagements." He has not anticipated his income, for the auditor found that no charge of " taking and using the funds of the estate " was made out against him. It is true that the tenth section of the will made him, as well as each of the other trustees, responsible for his own acts. But as was said in the very able argument of his counsel, that section " did not create any other liability than such as the law would create without it. Had it been omitted, his liability to the estate would have been what it is now—neither more or less." It happens that he has become liable to his father's estate, and not to a stranger. But it was from " liabilities " of all kinds that the income given him was to be protected.

Nothing is better settled than the rule which sustains such trusts as this. It has produced beneficent and just results. And it ought not to be evaded or infringed in any case that is fairly within its scope.

Decree affirmed at the cost of the appellants, and appeal dismissed.