# Heyl's Estate

Before Van Dusen, P. J., and Sinkler, Klein, Bolger, Ladner, and Hunter, JJ.

*Robert T. McCracken*, for exceptants.

*William N. Trinkle*, contra.

BOLGER, J., April 6, 1944.—The question is whether the auditing judge erred in refusing the demand of the remaining trustee and of Mrs. Jackson, the co-beneficiary of the spendthrift trust, to authorize the trustee to deduct from Mrs. Peace's income items of taxes, interest, etc., allegedly due under Mrs. Peace's agreement of 1930, and which have accrued since her repudiation of the agreement on December 3, 1942, on the ground that the 1930 transaction was revocable at will. Mrs. Peace does not object to sharing the loss of income.

Additional salient facts not appearing in the adjudication are that both life tenants of this trust are competent adult daughters of testator; and that although Mrs. Jackson at the audit of this account insisted that she has always disapproved the transaction the corporate trustee denied her assertion. It further appears that this investment was set forth in a prior account which was audited by this court on February 5, 1936, of which audit Mrs. Jackson received notice and she

has received and accepted the income from the investment for 12 years. The prior account was adjudicated May 14, 1936, later reopened and readjudicated March 27, 1937, and appeal taken to the Supreme Court: Heyl's Estate, 331 Pa. 202. It is repeated for the purpose of emphasis that both life tenants have expressly disclaimed any attempt to surcharge the trustee for loss on this investment.

Spendthrift trusts have long been the favorite of the law. In Riverside Trust Co. v. Twitchell et al., 342 Pa. 558, 561, Justice Drew quoted from Morgan's Estate (No. 1), 223 Pa. 228, 230:

"The law rests its protection of what is known as a spendthrift trust fundamentally on the principle of cujus est dare, ejus est disponere. It allows the donor to condition his bounty as suits himself, so long as he violates no law in so doing. When a trust of this kind has been created, the law holds that the donor has an individual right of property in the execution of the trust; and to deprive him of it would be a fraud on his generosity. For the law to appropriate a gift to a person not intended would be an invasion of the donor's private dominion: Holdship v. Patterson, 7 Watts, 547."

In Harrison's Estate, 322 Pa. 532, it is stated (p. 534):

"The recognition of a testator's right to protect his heirs from a presumed incapacity to manage inheritances is . . . a definite policy of the common law. It can only be abrogated, if at all, by nothing less than express, definite and positive enactment." See 2 Hunter's Pennsylvania Orphans' Court Commonplace Book, pp. 1282, 1283, para. 5(r) and (s).

We take it, therefore, that any attempt to vary the purposes of the trust or to divert the funds, principal or income, to other than the declared purposes set forth in the will must be most steadfastly resisted. The

primary consideration is the estate of the testator; the interests of the beneficiary are secondary: Siegwarth's Estate, 226 Pa. 591, 594.

The extent to which the law will protect this fundamental interest of the testator depends upon the phraseology of the particular instrument: Keeler's Estate, 334 Pa. 225. The terms of the instant will are very strict, not only as they inhibit the anticipation of or assignment of income or its subjection to any judgment, decree, attachment execution, or other process, but it is required that "all payments of income to each and every of the beneficiaries herein named shall be made to them directly" and that "the same shall only become and be the property of the beneficiary when actually received by him or her, and the trustees shall only be discharged of the same upon the own proper receipt of the beneficiary". Practically identical language was employed in Hays' Estate, 201 Pa. 391, 396, and Nixon's Estate, 101 Pa. Superior Ct. 152 (aff., 306 Pa. 261). In the Hays case the court observed:

"The principal of the fund was not hers and by the plain language of the will, the income could only become hers when it was paid by the trustee into her own hands, and her receipt was given therefor. The instrument creating the trust which is the law of the case, shields and protects the fund from the time it is produced until it is delivered to and accepted by the beneficiary. . . . While it is his [trustee's] duty to make the corpus of the estate productive, yet the obligations of the trust also require him to pay it to the cestui que trust. This is the consummation of his duties, and until that act is performed, he has not executed the trust."

In the Nixon case, the court refused to award accrued income to the estate of a deceased beneficiary because it was contrary to the provision "be payable to her only"; the quoted phrase was literally construed.

Our first problem, therefore, is whether Mrs. Peace's contract violates testator's property rights. Mrs. Jackson maintains that the agreement of 1930 "is nothing more than a partial receipt for her benefit" and that payment is being "actually received" by her in connection with a rental contract and, therefore, it does not violate the terms of the trust. She also contends that Mrs. Peace is estopped from asserting the terms of the trust in defense of her own wrong.

We are definitely satisfied that the engagement of Mrs. Peace breaches the provisions of the trust and cannot be enforced. It offends all three provisions previously mentioned. To hold that it is not an assignment is to ignore the presence of the word "anticipation". The interdictions forbid any distribution of income before it is actually earned and placed in her hands. Further, any decree or adjudication this court might enter charging the share with any sum as a result of this contract would be within the clause exempting the income from any judgment, decree, attachment execution, or other process of any court. Finally, we cannot subscribe to the suggestion that the 1930 letter was a receipt for money "actually received" by Mrs. Peace. Mrs. Jackson's thought patently would require us to hold that the trustees can now pay out Mrs. Peace's income for which she receipted 14 years ago, and continue to do so hereafter. We cannot accept this view. Mrs. Peace is, therefore, clearly within her rights in revoking her contract: Keeler's Estate, supra, where it was held that contracts of beneficiaries of spendthrift trusts that violate the provisions of the trust are revocable at will and are binding upon the cestui que trust only so long as he permits the trustee to honor them.

Pennsylvania appears to be the only State among those which recognize the doctrine of spendthrift trusts that permits any departure, except by statutory enact-

ment, from the otherwise rigid safeguards which the law throws around this type of trust. That departure is embodied in the line of cases including Miller's Estate, 333 Pa. 116, Thaw's Estate, 252 Pa. 99, King's Estate, 147 Pa. 410, and other cases cited in the adjudication and in the dissenting opinion. They all employ the equitable doctrine of estoppel and hold that where an adult competent beneficiary of a spendthrift trust, with full knowledge of the facts, consents to or affirms an investment made in violation of the terms of the trust the trustee cannot be surcharged at the instance of such beneficiary for any resulting loss of income. The clear objective of these cases is to protect innocent trustees personally from surcharge. We are now asked to extend this doctrine in favor of a cobeneficiary. Before proceeding to a discussion of this problem, which is the more difficult one, we momentarily advert to the question of the contract.

The 1930 contract is dual in character. It is an investment which includes a rental contract. Since none of the parties, including the parties litigant, has questioned the prudence of the investment, how does this affect this rental contract in the light of its repudiation? Were it not for the possibility of extending the rule of estoppel, there is no doubt that the obligation would be effectually canceled. In our opinion in the light of present conditions and of the law of the decisions cited, it constitutes no more than a guaranty or an agreement of indemnity protecting the trustee against surcharge. Consequently, there having been no request for our award of surcharge, Mrs. Peace's obligation on her contract comes to an end. Indeed it is an open question whether Mrs. Peace's interest would have been liable over to the trustee had the latter been surcharged at Mrs. Jackson's instance, because the loss claimed by her would be her loss only, whereas in the cited cases the loss sought to be recouped was that of

the complaisant beneficiary, the one who induced the transaction.

We refuse to extend the estoppel as requested for three reasons: First, because the rule of law protecting testator's property rights in the trust shuts off consideration of the equities between the co-beneficiaries—the will "is the law of the case". Whenever the right of a party is established by law, equity does not have power to change it: Abrahams, Admx., v. Wilson et al., 134 Pa. Superior Ct. 297; Albright v. Albright, 228 Pa. 552. Second, Mrs. Jackson, the co-beneficiary, is guilty of acquiescence; and, third, even though she were entirely innocent, there is authority contrary to her contention.

Treating the latter two reasons in their inverse order, we affirm the analogy drawn by the auditing judge between this case and Overman's Appeal, 88 Pa. 276. There the beneficiary of a spendthrift trust was also the trustee and as such negligently administered the estate to its loss. However, the court refused the request to apply his share of income to cover the loss. While it is true that the action of the trustee-cestui que trust in the cited case was involuntary and there was no contract involved, nevertheless the loss in the instant case was just as involuntarily incurred and the degree of liability to repay was at least equal to that of the trustee-cestui que trust. Therefore, the auditing judge's conclusion properly follows that, if Overman's Estate, supra, forbids application of the cestui que trust's income for something he did as trustee, all the more in this case should Mrs. Peace be not estopped because of something she did purely as cestui que trust.

What Mrs. Jackson and the trustee seek is specific performance of the 1930 contract. Such equitable relief calls for the exercise of the court's grace rather than for the application of any principle of law: Blue

Ridge Metal Manufacturing Co. v. Northern Pennsylvania Power Co., 327 Pa. 424. In reviewing the investment and Mrs. Peace's promise to pay, there is grave danger in exercising hindsight rather than viewing the affair in the light of the then-existing conditions. It seems now to have been a clear violation of the trust and Mrs. Peace is bitterly condemned for changing her mind. While not entirely clear of doubt, nevertheless there are circumstances present in this record from which a finding could readily have been made, had it been required, that the investment was a proper one. The codicil of June 3, 1919, authorizes investment in real estate: ". . . and now give my executors and trustees power to invest in mortgages and real estate . . ." Mrs. Peace's share of income was adequate. The trustees also obtained the agreement of Mrs. Peace's son, Edward C. Peace, a remainderman, to take the property in distribution at a fair market value. Furthermore, the contract was kept faithfully for more than 12 years, and according to the letter of repudiation Mrs. Peace was compelled to give it up for a reason over which neither she nor anyone else had any control, and which is the chief mischief of the case, viz, the depletion of income, which might have happened to any tenant. That is not denied and it constitutes a natural reason for Mrs. Peace to terminate the contract. The trustees are as much, if not more, open to criticism than Mrs. Peace, since they were directed not to do the very thing that they did—engaging to invade Mrs. Peace's income in violation of the trust and thereby involve Mrs. Jackson's interest. If they did wrong they should not be heard in its defense. On the other hand, Mrs. Jackson has contributed to her loss by her inaction. She admits she knew of the venture when it was made, but says she protested it. The corporate trustee denies this protest. It then appears that at the audit of the 1936 accounting, of which Mrs. Jackson had notice, she made no objection, although certain

remaindermen objected to other items, and when overruled carried their case to the Supreme Court. In failing to render any objection to the investment in 1936, Mrs. Jackson, being an adult competent person in possession of all of the facts, must be presumed to have approved the transaction in all of its aspects, both in matters of fact and of law, including the right always reposing in Mrs. Peace to revoke her contract at will. Had she registered a complaint at that time, it is quite possible a change in the investment might have been made to the present advantage of everybody concerned. By sitting idly by she has permitted the situation to go on, in a sense speculating on the result, knowingly accepting the fruits of the transaction for all these years, and must be held therefore to have acquiesced in it. She has had her day in court and her claim now is too late: Rambo's Estate, 327 Pa. 258. She is in no better position actually than the cestui que trust in Thaw's Estate, supra, where the latter, by permitting psychiatrists employed by the trustees to examine him to determine his sanity, was held to have acquiesced in their employment, thereby subjecting his income to payment of the bill for their services.

The exceptions are dismissed and the adjudication is confirmed absolutely.

Judges Sinkler, Klein, and Ladner dissent in an opinion by Klein, J.

### Dissenting opinion

KLEIN, J., dissenting.—Testator, who died in 1926, left his residuary estate of approximately $650,000 in trust, the net income to be paid in equal shares to his two daughters, Matilda Heyl Jackson and Kate Heyl Peace, for the period of their natural lives. Upon their deaths the income is payable to their issue, with further provisions not material to this discussion.

The will then provides, inter alia:

"Item—I direct that all payments of income to each and every of the beneficiaries hereinbefore named, shall

be made to them directly, without the power of antici-
pation or assignment by them and so that the same
shall not be subject to any judgment, decree, attach-
ment, execution, or other process of any court, but the
same shall only become the property of the beneficiary
when actually received by him or her and the trustees
shall only be discharged of the same upon the own
proper receipt of the beneficiary."

On December 29, 1930, one of the daughters, Kate
Heyl Peace, addressed a letter to the trustees in which
she stated that she had been unable to find a house
which was acceptable to her as a home and requested
them to advance $35,000 for the purchase of a lot and
the erection of a house thereon. In this letter she re-
quested that her share of the income should be charged
with interest at six percent on the total amount paid
for the property, together with taxes, insurance, and
repairs. She further agreed that if she should vacate
the house these arrangements should continue "so that
the income of this estate shall not suffer by reason of
this investment".

The trustees complied with her request and money
was advanced for the purchase of the lot and the erec-
tion of the house. She moved into the house and the
charges were made against her share of the income in
accordance with her agreement. She remained in the
house until September 1942, when she had a change of
heart and moved out. On December 3, 1942, she wrote
to the trustees revoking the agreement and demanding
that her share of the income be relieved from the
charges for carrying the property.

The question presented to us is whether she can avail
herself of the protection contained in the spendthrift
provisions and saddle one half of the burden of carry-
ing this unprofitable investment on her sister. The
auditing judge held that she was within her rights. We
do not agree with this conclusion.

We do not regard the purchase of the home for Kate Heyl Peace as a violation of the restrictions contained in the will. The transaction does not, in our opinion, constitute an anticipation. An anticipation, as we understand it, is any payment or transfer on account of distribution to a beneficiary, or to someone in his behalf, at any time before the date fixed for such distribution by the instrument creating the trust. The purchase of the house in the present case cannot be considered a distribution to the life tenant. It was merely an investment—and a proper one under the terms of the will—made at her request. Nor was the transaction an assignment in the sense usually contemplated by the creator of a trust. The contracting life tenant was no less entitled to her full share of the income from the estate as and when it became payable. All that was done in this case was to segregate a specific asset of the estate, acquired at the request of one of the life tenants, and to earmark the income-producing power of that asset to the exclusive credit or benefit of the life tenant who solicited the investment. The other income beneficiary might have been heard to object to the transaction as a preferential distribution. However, Mrs. Peace certainly cannot disclaim it as an illegal anticipation or assignment.

But even if we assume that the arrangement made with the trustees was a breach of the restrictions contained in the will, we are firmly of the opinion that Kate Heyl Peace is estopped from evading the legal consequences of her agreement. The courts in this State have always been loath to permit a competent beneficiary to repudiate his voluntary act or agreement to the detriment of innocent persons, regardless of the fact that the beneficiary's income was subject to the protection of spendthrift provisions. Although our attention has not been directed to any reported case in which a beneficiary has attempted to unload a share of his burden on other income beneficiaries, the courts

have consistently refused to permit the beneficiary to evade the consequences of his act or conduct at the expense of the trustee.

In King's Estate, 147 Pa. 410 (1892), despite a prohibition against anticipation, the trustee was permitted to take credit for payments made to the cestui que trust on account of distribution of income before any income was actually received by the trustee. Justice Green, in the opinion of the Supreme Court, said at page 414:

"The cestui que trust had actually received the payments made in perfect good faith by the trustee, and she was as much in fault, in violating the clause against anticipation, as the trustee was in making the payments. She has, therefore, no equity to be heard against her own wrongdoing, and we regard her as estopped from saying she had no right to receive the money on account of the clause against anticipation. . . . It would be strange, indeed, if she, having received it from the trustee in advance of the time when she could have compelled its payment, because it was not yet received by him, could be permitted to say she had no right to receive it, under the will, at the time when she did receive it, and thus assert her own wrong, not to prevent, but to perpetrate, a gross injustice. We will not permit it."

In Thaw's Estate, 252 Pa. 99 (1916), the trustee expended funds of a spendthrift trust estate for medical examinations to ascertain if the beneficiary's mental condition was such as to warrant the trustee to pay the income directly to him. The beneficiary voluntarily submitted to the examination. The Supreme Court held that he was estopped from contesting the expenditures which he himself encouraged the trustee to make.

In Jones' Estate, 199 Pa. 143 (1901), the cestui que trust of a spendthrift trust, in order to avoid prosecution for nonsupport of his wife, agreed to give her a

portion of his income from the trust estate. The agreement provided that checks for the portion of the income payable to the wife should be drawn to the order of the cestui que trust, endorsed by him to the wife's order, and then held by the trustee for delivery to the wife. The court dismissed the efforts of the beneficiary to collect this income a second time from the trustee. To the same effect, see Shuster's Estate, 26 Dist. R. 232 (1917).

In Perkins' Estate, 19 D. & C. 463, affirmed in 314 Pa. 49 (1934), an effort was made to surcharge a trustee for investing the funds of the trust estate at the request of the life tenant, whose income was subject to spendthrift provisions, for the purpose of erecting a home for the life tenant and for making other investments which proved to be improvident and which were in violation of the terms of the trust. Our former colleague, Judge Stearne, refused to surcharge the trustee and said (p. 466):

"It appeals to me as being most unfair and unjust to permit a person to induce the making of investments —however unwise—and then to permit him, or any person or persons claiming through or under him, to repudiate such investments and to benefit thereby."

This language of Judge Stearne was adopted verbatim both by the court en banc and by the Supreme Court in affirming his decision.

The same situation existed in Miller's Estate, 333 Pa. 116 (1939), in which the trustee made an improvident investment at the request of the beneficiary. Mr. Justice Stern, in refusing a request for surcharge, said (p. 118):

"It need scarcely be stated that such a claim is not only without sanction of law, but violates instinctive principles of morality and fair dealing. It apparently arises from appellee's erroneous impression that, because the beneficiary of a spendthrift trust cannot terminate it (*Harrison's Estate*, 322 Pa. 532), nor, by

agreement with the trustee or otherwise, modify or ameliorate its restrictions, he is likewise excused from the legal consequences of requesting or acquiescing in the selection of investments to be made by the trustee. It is hornbook law, as expressed in *Macfarlane's Estate*, 317 Pa. 377, 382, 383, that 'A competent beneficiary who with full knowledge of the facts and of his rights expressly consents to or affirms an investment by the trustee cannot, in the absence of fraud, thereafter question its propriety.' In this respect there is no difference between the beneficiary of a spendthrift trust and any other trust."

Justice Stern stated, further, at page 119:

"In Griswold on 'Spendthrift Trusts,' section 305, it is stated: 'Various questions may arise in the course of the administration of a spendthrift trust as to the effect of the consent of the beneficiary. May the beneficiary hold the trustee liable for an act or omission which was done at the beneficiary's request or with his consent? . . . Where the beneficiary is an adult and *sui juris*, there would seem to be no reason why he should not be bound by his conduct here as much as in any other situation . . .'; and in section 307: 'It is a rule of general application with respect to ordinary trusts that a beneficiary cannot hold the trustee liable for an act or omission as a breach of trust if the beneficiary consented to it. This principle is also generally held to be applicable to spendthrift trusts. Thus, if a trustee makes improper investments, or wrongfully disposes of a part of the trust property, or wrongfully delegates his authority, or commits other breaches of trust, the beneficiary may not hold him liable if he has given his consent to what was done.' "

If a beneficiary, who is sui juris, is estopped from repudiating, as between himself and his trustee, the legal consequences of an improvident and improper investment made by the trustee at his request, notwithstanding the existence of spendthrift provisions, how

much stronger is the appeal to our consciences of a beneficiary whose income is in danger of being depleted by virtue of a transaction apparently made without her knowledge or consent? Trustees are chosen to administer spendthrift trusts for the express purpose of protecting the beneficiaries against their own folly and improvidence. They are paid for the responsibility they assume. No share of this responsibility should be shifted to an innocent beneficiary. Furthermore, we must not overlook the fact that the same spendthrift provisions, which are here relied upon to protect the life tenant who induced the making of the investment in question, were designed by the testator to give equal protection to the other life tenant. It would be a shocking state of affairs if Mrs. Peace were estopped from rescinding her agreement against the trustees, who were parties to it, but was free to unload half of the consequences on her sister, who was not a party to it. In our opinion, it would be more unfair and unjust to permit Kate Heyl Peace to repudiate the investment made at her request and to benefit by her repudiation at the expense of her sister, Matilda Heyl Jackson, than it would have been in Perkins' Estate and Miller's Estate, supra, to permit the beneficiaries to repudiate the legal consequences of their acts at the expense of the trustees, to whom the testators looked to protect the beneficiaries against their own improvidence.

The trustees in the present case acted in good faith within the authority conferred by the will and procured for Mrs. Peace a home which she wanted and said that she needed, and which was apparently within her financial means. It would clearly be a miscarriage of justice to permit her now to repudiate her voluntary act at the expense of her sister. The agreement made by her with the trustees must therefore be enforced.

We might add that the original agreement provided for the payment of interest at six percent on the funds of the estate invested in this property. The record dis-

closes that subsequently the rate of interest was reduced to five percent. We see no reason why the trustee could not, in its discretion, grant further relief to Mrs. Peace by reducing the rate of interest to four percent, which is approximately the current rate of income earned by trust estates in Pennsylvania.

I would therefore sustain the exceptions.

Sinkler and Ladner, JJ., join in this dissent.