Matter of the Accounting of Boyd McDowell, Casper G. Decker and Jervis Langdon, as Executors and Testamentary Trustees under the Last Will and Testament of Robert M. McDowell, Deceased.

(Surrogate's Court, Chemung County, January, 1918.)

Trustees — testamentary — accounting — wills — executors and administrators — trusts — unlawful investments — commissions.

A testamentary trust fund may not legally be used for purposes not provided for in the will.

The act of testamentary trustees in turning over to themselves as executors a certain part of the trust fund, pre-

Surrogate's Court, Chemung County, January, 1918. [Vol. 102.

sumably to cover a deficit referred to in their account, is illegal, and such sum must be recovered by them as trustees, and as executors they will be directed to return it forthwith to themselves as trustees. The legal title to the trust fund having vested in the trustees they could not legally part with any portion thereof except by a judgment or order of a court of competent jurisdiction.

In construing a direction by will that testamentary trustees hold, manage, invest and reinvest all of the trust property as they shall deem " wise and judicious and for the best interest of the beneficiaries " it is proper as a true guide to testator's intention to examine investments made by him in municipal bonds which went into and formed the trust funds in order to ascertain what he considered " wise and judicious " investments.

Upon the hearing of objections to the account of executors and trustees charging that certain investments made by one of the trustees in bonds had defaulted in payment of interest, it appeared that all of said bonds were those of new companies just organized and in some instances had not yet commenced to do business; in other words, were speculative and hazardous ventures. It further appeared that in the making of such investments there were not employed such vigilance, sagacity, diligence and prudence as men of discretion and intelligence employ in like matters of their own affairs. *Held*, that the trustees should be charged with the amount paid for the securities that had defaulted together with interest on the several sums paid for the different bonds less any amount received on account of interest.

That the estate having been depleted by the making of the unlawful investments no deductions should be allowed for commissions and the decree herein will direct that the trustees reimburse the estate for the amount of the unlawful investments within one year from the entry thereof when the trustees' commissions may be computed and allowed.

A proceeding was started in this court by the beneficiaries of the trust created by the will of the decedent to compel an accounting by the executors. The executors filed an account, both as executors and as testamentary trustees. Objections were filed to the account, a trial was had, a decision made, and appeal

was taken to the Appellate Division of the Supreme Court. *Matter of McDowell,* 178 App. Div. 243. The Appellate Division decided that the account had been settled in certain respects and that there had been a mistrial in certain other respects before the surrogate and a *pro forma* order of reversal was entered and the matter sent back to the surrogate for further hearing for the purpose of giving the accounting parties the right to defend investments made by them by invoking the discretion which the will placed with them as trustees. The matter was regularly brought on by the petition of the beneficiaries of the trust, on due notice given to the accounting parties. Practically no further evidence was offered in the proceeding as sent back by the Appellate Division, except that some proof was filed as to the value of certain attorneys' services rendered. A supplemental account was filed by the executors, as such, to which objections were filed by John G. McDowell and Clara B. McDowell.

The trustees also filed an account in which all three joined, together with a petition asking for its settlement. A citation was thereupon duly issued to all parties interested in the trust estate. On the return of the citation the beneficiaries of the residuary trust, namely, John G. McDowell and Clara B. McDowell, appeared and filed objections to the account, and a hearing was thereupon duly had.

None of the remaindermen have appeared and filed objections except Clara B. McDowell.

Baldwin & Allison (E. J. Baldwin and Thomas M. Losie, Jr., of counsel), for executors-trustees.

John F. Murtaugh (Richard H. Thurston, of counsel), for John G. McDowell and Clara B. McDowell, beneficiaries and residuary legatees.

Surrogate's Court, Chemung County, January, 1918. [Vol. 102.

SWARTWOOD, S. Inasmuch as it has been decided herein (*Matter of McDowell*, 178 App. Div. 246) that the duties of executors and trustees coexist, it will perhaps be better to take up the decision of all questions raised by the objectors to the accounts as filed, both as executors and trustees, at the same time in one decision, without regard to the question of whether the two proceedings should be united. In *Matter of McDowell, supra,* the court said: "They have treated their duties as executors and trustees as coexistent, and have made no discrimination in their bookkeeping between assets, receipts and payments by them as executors or as trustees * * *.

"It is reasonable to assume, therefore, that the testator had in mind, just as the executors have had, that the duties were coexistent."

In the summary statement attached to the executors' account they charge themselves

| | |
|---|---|
| With amount of the inventory (including real estate) ..................... | $163,980 49 |
| With gains on property inventoried..... | 195 95 |
| With property not inventoried............ | 103 50 |
| With income collected on securities held by the executors (not turned over to themselves as trustees).............. | 479 00 |
| Making a total for which they are accountable as executors of................. | $164,758 94 |

The executors credit themselves with

| | |
|---|---|
| Securities, still on hand................ | $1,025 00 |
| Nuggets, etc., undisposed.............. | 50 00 |
| Property not yet delivered............. | 60 00 |
| Funeral expenses paid................. | 487 50 |
| Transfer tax paid..................... | 3,798 26 |

Misc.] Surrogate's Court, Chemung County, January, 1918.

| | | |
|---|---:|---:|
| Debts paid ........................... | $90 | 37 |
| Legacies paid........................ | 12,428 | 76 |
| Securities turned over to trustees....... | 124,216 | 28 |
| Cash paid trustees for investment....... | 3,635 | 43 |
| Income paid to trustees on securities retained in executors' hands.......... | 479 | 00 |
| Household goods turned over to trustees | 1,037 | 00 |
| Real estate........................... | 15,000 | 00 |
| Administration expenses prior to this accounting ......................... | 121 | 10 |

Administration expenses since the ac-
accounting was started:

| | | |
|---|---:|---:|
| Stenographers' fees......... | $155 | 69 |
| Printing bills.............. | 641 | 01 |
| Attorneys' expenses to Albany and stenographers for brief work ...................... | 250 | 00 |
| Attorneys' fees and expenses for Executor Langdon..... | 221 | 25 |
| Attorneys' fees and expenses for Executor Decker........ | 500 | 00 |
| Attorneys' fees and expenses for Executor McDowell.... | 2,000 | 00* |
| Counsel fees for Executor McDowell ................ | 2,000 | 00* |

|  | | |
|---|---:|---:|
| | 5,767 | 95 |

The account also shows that on January 17, 1910, Boyd McDowell, as one of the executors paid to himself on account of commission for himself............... 1,800 00

$169,996 65

This state of the account shows a deficit of $5,237.71.

\* $500 only has been paid.

The testimony of executor McDowell and the account show that the trust fund, which consisted of practically all the securities left by the testator, except the two $500 bonds retained in their hands as executors, and the sum of $3,635.43 cash were turned over to the trustees in September, 1909.   The household goods were also turned over to the trustees at the same time.

These funds and these securities immediately vested in the trustees and became a trust fund, as provided for under the will, and could be used for no other purposes than those provided in the will.

The account of the executors shows that since this accounting was commenced and since the original account herein was filed in April, 1916, the trustees have turned over to the executors the sum of $8,500 presumably to cover the deficit referred to in the foregoing statement.   This act on the part of the trustees was illegal, and that sum must be recovered by the trustees and the executors should, by the decree to be entered herein, be directed to return it forthwith to the trustees.   When the executors turned these securities and funds over to the trustees " they parted with title and possession thereof and were discharged from all liability and divested of all power concerning them." This quotation is from the opinion in *Leggett* v. *Stevens*, 185 N. Y. 76, where the same principle was involved, as well as in the cases cited in the opinion.

" A testamentary trustee takes title to the trust estate by the instrument creating the trust.   He takes this title the same as though his legal title had been conveyed to him by a deed."   Jessup Surr. (3d ed.) § 982.

" Except as otherwise prescribed in this chapter, an express trust, valid as such  in its creation, shall vest in the trustee of the legal estate, *subject only to the execution of the trust,* and the beneficiary shall not take

any legal estate or interest in the property, but may enforce the performance of the trust." Real Prop. Law, § 100.

The transferring by the trustees of $8,500 back to the executors was not an act in the execution of the trust and the act was therefore illegal. Legal title having vested in the trustees, they could not part with any part of the fund except by a judgment or order of a court of competent jurisdiction. An act of this same kind was condemned in *Matter of Schaefer,* 178 App. Div. 134.

The taking of commissions by executor Boyd McDowell, amounting to $1,800, in January, 1910, was premature, and for the purposes of this accounting that sum must be regarded as in the hands of the executors. This then makes a total in the executors' hands of $1,800 plus the amount of the Kennedy Valve bond and the Nutwood Drainage bond and accrued interest thereon, amounting to $1,025, as shown by the account, and, in addition thereto, the cash on hand as shown by the account, $530.24, making a total in the hands of the executors out of which to pay their commissions and the expenses of the accounting of $3,355.24.

In the matter of the commissions of the executors, it having been decided herein (*Matter of McDowell, supra*) that the offices of executors and trustees coexisted, they are entitled to but one set of commissions. In fact, the court stated at page 246, that: " If the executors had treated the trust estate as distinct, and had kept separate accounts and claimed commissions in each capacity, it would not be unreasonable for life beneficiaries and the residuary legatees to contest that claim. (*Matter of Zeigler,* 218 N. Y. 544, 551.)" We quote from the opinion at page 551, " That the same person may be entitled to compensation as executor, and also as trustee, in respect to the same estate, or

some part thereof, is undoubtedly true, but does not follow in every instance where trust duties are imposed upon an executor. Where, by the terms or true construction of the will, the two functions with their corresponding duties coexist, and run from the death of the testator to the final discharge; interwoven, inseparable and blended together, so that no point of time is fixed or contemplated in the testamentary intention at which one function should end and the other begin, *double commissions or compensation in both capacities cannot be properly allowed.* (*Johnson* v. *Lawrence,* 95 N. Y. 154, 159)" And see *Matter of Kellogg,* 214 N. Y. 460.

It would, therefore, seem to be proper that the *executors* be allowed commissions on the actual money received and disbursed by them, as such, and, inasmuch as the estate amounted to more than $100,000, they are each entitled to a full set of commissions on such sum. This preserves to them the right, if they are entitled, as will hereafter appear, to commissions as trustees for having received and disbursed the income of the trust fund, and upon the final distribution of this estate to the residuary legatees they may receive their commissions as trustees upon the principal of the trust fund. By working it out in this way, in accord with the decision in the case by the Appellate Division, they will, when the administration of the whole estate is finally completed, each have received one full set of commissions on the principal of the whole fund and such commissions on the income received and disbursed by them as they may be entitled to. *Matter of Slocum,* 169 N. Y. 153, 160.

The total cash received and disbursed as executors is $20,391.23. The commissions of one executor would be $393.91 or $1,181.73 for the three. Inasmuch as the executors received in January, 1910, $618.27 more than

they were entitled to as commissions, the interest thereon to date, amounting to $293.51, should be deducted from $1,181.73, the commissions to which they were entitled, leaving as their net executors' commissions to which they are entitled on this proceeding $888.22. This leaves a balance in the hands of the executors of $2,467.02, which is hereby allowed them, with which to pay their disbursements and counsel fees, as shown in the foregoing statement. This does not pay the amounts in full, as shown by the statement, but, being the only funds in their hands, is all that can be allowed. A considerable portion of the expense was unnecessarily made by one executor insisting on accounting as trustees in the executors' proceeding, in which action his co-trustees refused to join.

This closes the executors' account, with the exception of delivering the articles specifically bequeathed. The decree should direct their delivery.

We now pass to the principal question involved in these proceedings, namely, that for the consideration of which the matter was sent back to this court by the Appellate Division, and raised by the objections filed to the account. These objections charge that the investments made by the trustees in bonds that have defaulted in the payment of their interest were illegal. Beneficiaries may elect to approve or reject all or part of investments. *King* v. *Talbot,* 40 N. Y. 76.

The trust estate consisted of securities $124,216.28, cash $3,635.43, the homestead appraised at $15,000, and the household furniture and furnishings, $1,037.

The bonds that have defaulted in their interest are are follows:

Bonds of the Rochester, Syracuse and Eastern Railway Company, par value $15,000, cost $13,445.

Bonds of the Empire Lumber Company, par value $10,000, cost $9,000.

Bonds of the Lewiston Land and Water Company, par value $4,500, cost $4,500.

Bonds of the Gulf, Florida and Alabama Railroad Company, par value $13,000, cost $11,425.

Bonds of the Superior California Farm Lands Company, par value $11,000, cost $11,000.

These bonds are some that have been exchanged by the trustees for bonds originally purchased by them of the Sacramento Valley Irrigation Company. This Company defaulted in its payment of interest prior to the time that the exchange was made.

Bonds of the Birmingham, Ensley and Bessemer Company, par value $16,000, cost $13,600.

The trustees' account, filed September twelfth last, shows that these bonds have been transferred for Birmingham Tide Water Railway Company five per cent bonds, par value $8,000, thereby showing a loss of $5,600 on this purchase.

This makes a total of securities of the par value of $69,500 which cost $62,970 that have defaulted.

With the purchase of three of the foregoing bonds there was given quite an amount of bonus stock. These bonus stocks were all taken in the name of Boyd McDowell individually.

The life beneficiaries charge that these investments were illegal on several grounds, as follows:

*First.* That they were the bonds of new and untried ventures and that the discretion given the trustees by the will in the matter of investments is not broad enough to make legal the investments in the securities in question. That said investments were made carelessly, negligently and not in the exercise of a sound discretion.

*Second.* That in construing the will of the testator to ascertain what he meant by the direction to his trustees " that they hold, manage, invest and reinvest

all of said trust property as *they shall deem wise and judicious and for the best interests of the beneficiaries* " named, consideration should be given to the character of investments made by the testator himself. In other words when he enjoined upon his trustees that they invest wisely and judiciously it is proper to examine his investments to ascertain what he considered wise and judicious investments as a true guide as to what he had in mind in making use of the language quoted.

*Third.* That the law requires that the trustees shall act jointly, and that the accounts, the proofs and the evidence herein show that there was no joint action on the part of the trustees in making the investments complained of .

*Fourth.* That the investments were illegal for the reason that they were, with one exception, in the bonds of companies organized and doing business outside the state of New York and beyond the jurisdiction of our courts.

Let us first inquire into the status of these defaulted bonds at the time of their purchase.

Thirteen thousand four hundred and forty-five dollars were invested in Rochester, Syracuse and Eastern Railway Company's bonds, of the par value of $15,000. Moody's Manual for the year 1910 at page 2138 gives the information that this railway company was incorporated in November, 1901, in New York state, to build an electric road from Rochester to Syracuse, a distance of eighty miles. The first section of the road from Rochester to Port Byron, a distance of fifty-five miles, was completed on the 1st of July, 1908. An extension from Port Byron to Syracuse, a distance of twenty-five miles, was put in operation in December, 1909. It had twenty-five passenger cars, two express cars, three work cars, four snow plows, one power

station, six substations and three engines to generate power. The bonded debt outstanding on June 30, 1909, was $3,739,000; current liabilities and accrued interest a little over $400,000. The balance sheet for that year showed a deficit of $5,989. For the year ending June 30, 1910, as shown by the 1911 Moody Manual, page 2298, the deficit was $13,894. For the year ending June 30, 1911, as shown by Moody's Manual for 1912, at page 2214, the deficit was $22,064 and in 1912 the deficit had increased to $67,844. These bonds were purchased by the trustees as follows: On March 4, 1910, $2,000; on March 8, 1910, $8,000; on June 18, 1910, $5,000, when there was a deficit in the treasury and the road had been in operation only a few months.

The next bonds in the list are the six per cent bonds of the Empire Lumber Company, of the par value of $10,000, costing $9,000, and were purchased in July, 1910. The property of this company consisted of timber lands located in Vancouver Island, B. C. The company was incorporated in the state of Delaware in December 1909. The bonded debt is $4,000,000. The bonds were dated July 1, 1910. It is evident that the company had at the time of the purchase of these bonds, or about the time of their date, begun business, as would seem from the following taken from Moody's Manual, published in 1911, page 2648: ''The company's plans are for the erection of mills that will have an annual capacity of 100,000,000 feet of timber. Pending the completion of the mills, logs will be transported to tidewater and sold to other saw mill operators, many of whom have no timber of their own.'' With the purchase of these bonds was given a bonus of 150 shares of the common stock of the company of the par value of $100 per share. This stock was taken in the name of Boyd McDowell.

The next bonds in the list are the seven per cent bonds of the Lewiston Land and Water Company, of the par value of $4,500, cost $4,500.   These bonds were purchased April 27, 1912, and defaulted April 1, 1915. From Moody's Manual for the year 1913, showing the statement of the company for the year 1912, it appears, page 4415, that this company was incorporated in Oregon and Idaho in 1905, owns 7,232 acres of land lying in or overlooking the city of Lewiston, Idaho, irrigation is made possible by the Lewiston-Sweetwater Irrigating Company.   The bonded debt is $1,014,500.   These bonds were dated October 1, 1911. It appears by the terms of the mortgage securing the bonds that $150 per acre is deposited with the trustee as a sinking fund to retire the bonds from all lands released under the mortgage.   It would appear from this statement that the object of the company was to sell off lands at a profit.   It also appears in the same Moody's Manual, on page 4416, that in addition to the $1,014,500 of seven per cent bonds referred to, there were also outstanding December 31, 1912, $20,000 first sixes, dated November 1, 1906; $79,000 first sixes dated April 1, 1908; $174,000 first sixes dated January 1, 1910; and $68,000 seven per cent gold notes, dated December 15, 1909.   The bonds purchased by Mr. McDowell for the trust fund were, therefore, not first mortgage bonds, but there were first mortgage bonds of $273,000 ahead of them.

The next bonds in the list are those of the Gulf, Florida and Alabama Railroad Company, par value $13,000, cost $11,425.   These were five per cent bonds and were purchased on the following dates:   April 24, 1913, $2,000; October 9, 1913, $10,000; January 23, 1914, $1,000.   With each of these $1,000 bonds there were received by Boyd McDowell four shares of the common stock of the company of the par value of $100

Surrogate's Court, Chemung County, January, 1918. [Vol. 102.

each, the certificates being taken in his name. It appears from Moody's Manual for the year 1912, page 1094, that this company was incorporated in the state of Florida in 1911, to build a railroad from Pensacola, Fla., to .Jasper, Ala., a distance of about 300 miles. Late in the year 1911 the company acquired the Southern States Lumber Company's Railroad extending from Cantonment, Fla., to Local, Ala., about sixty miles. On April 1, 1912, the road was completed from Local to Pensacola, Fla., about eighty-two miles, with six miles of sidings, four locomotives, three passenger cars, fifty freight cars, one hundred and fifty flat cars, two cabooses and four service cars. The authorized bonded debt was $10,000,000 of first mortgage gold fives, dated July 1, 1911. From Moody's Manual for the year 1913, page 530, it appears that the road was still under construction. A few more miles of siding had been added and a very little more equipment. No financial statement is given in either the 1911 or 1912 reports just referred to, and it is difficult to understand from the reports printed to what extent the company was doing business, if at all, in the years 1911 and 1912. The bonds were purchased $12,000 in 1913 and $1,000 in 1914.

The next bonds in the list are the Sacramento Valley Irrigation six per cent bonds, par value $11,000, cost $11,000. Five thousand dollars of these bonds were bought on May 13, 1910, and $6,000 on June 18, 1910. From Moody's Manual for the year 1910, page 2984, it appears that this company was incorporated in August, 1909, in the state of Delaware, to engage in the development of irrigation of agricultural lands in California. It controls by ownership and through option more than 100,000 acres of rich agricultural and fruit lands and is supplying water to land owners through sixty miles of main canal already

completed. It is rapidly extending its irrigation system which will ultimately supply 250,000 acres for which its water rights are amply sufficient. The bonded debt was $2,000,000, six per cent bonds, dated June 1, 1909, just a year prior to the date the trustees made their purchase of these bonds. The total authorized issue of bonds was $15,000,000, limited to $10,000,000 outstanding at any one time. The bonds are secured by a first lien on the canal systems, the water rights and purchase money mortgages deposited with the trustee. The basis for retirement of the bonds, as well as the source of interest payments, is the annual payments due on the purchase money mortgages taken on the sale of property and held by the trustees. It seems that the plan of the company was to sell off irrigated land on the installment plan taking back purchase money mortgages to be deposited with the trustee. It does not appear from the foregoing report whether the company had actually commenced to do business. From Moody's Manual for 1911, page 1446, it appears that the bonded debt, presumably at the close of the year 1910, was $7,551,000 outstanding. In this report no financial statement is given so that it is impossible to know whether the company was actually engaged in the business for which it was organized.

The next bonds in the list are those of the Birmingham, Ensley and Bessemer Company, par value $16,000, cost $13,600. With these bonds there were given ninety-six shares of the common stock, par value $100, each, and sixty-four shares of the preferred stock, all taken in the name of Boyd McDowell. These bonds were purchased on September 25, 1911, and defaulted in the payment of their interest on September 1, 1914. From Moody's Manual for the year 1912, page 2618, it appears that this company was incorporated in

19

1911 in the state of Alabama to own, operate and maintain an electric passenger and freight railroad in and adjacent to the city of Greater Birmingham, Ala., starting at East Lake, six miles east of Birmingham. The railroad will pass through and serve the suburbs of Woodlawn and Avondale, thence through the city of Birmingham under the new terminal station; thence via Fifth avenue through Smith Park, Smithfield, Earl Place, Tuxedo, Ensley and Corey into the city of Bessemer, approximately eighteen miles. Franchises run for ninety-nine years except those covering Fifth avenue which have been purchased outright, together with other rights of way. Construction and equipment will be of modern design. Bonded debt, $3,000,000, first gold fives, dated March 1, 1911. No financial statement is given for that year, presumably for the reason that the company was just commencing to build its lines. From the report published in the 1913 Moody's Manual, at page 1793, it appears that cars began operation over a portion of the lines then completed on September 5, 1912; in other words the road was not in operation until one year after the trustees purchased the bonds.

It appears from the foregoing that all the bonds that have defaulted were those of new companies that had only just been organized, and, in some instances, had not yet commenced to do business.

The Rochester, Syracuse and Eastern Railway Company's road was not completed in 1910, when the bonds were purchased, and on that date there was a deficit in the treasury. A part of the road had been completed in July, 1908, another part in December, 1909. The bonds were purchased in March and June, 1910, so that these bonds can hardly be said to be seasoned securities.

The bonds of the Lewiston Land and Water Com-

pany, dated October 1, 1911, were, in fact, second mortgage bonds, and were purchased in April, 1912. The company had been incorporated in 1905, but the date is not given when it commenced to do business, and the nearest that can be ascertained is that on November 1, 1906, $20,000 first six per cent mortgage bonds were issued. These bonds cannot, therefore, be considered seasoned securities.

The Gulf, Florida and Alabama Company was incorporated in Florida in 1911 to build a railroad, which was still under construction in 1913, when most of the bonds were purchased. These bonds cannot be characterized as seasoned securities.

The Sacramento Valley Irrigation bonds were dated June 1, 1909, and were purchased in May and June, 1910. It does not appear to what extent the company was engaged in the business for which it was organized at the time the bonds were purchased. These bonds cannot, therefore, be characterized as seasoned securities.

The bonds of the Birmingham, Ensley and Bessemer Company were dated March 1, 1911, and were purchased September 25, 1911. The company was incorporated in 1911 in the state of Alabama. Its railroad line was in process of construction at the time the bonds were purchased. A portion of the road was completed for operation in September, 1912, a year after the bonds were purchased. These bonds cannot be characterized as seasoned securities.

The statement is made after each of the foregoing bonds, that they cannot be characterized as seasoned investments, for the reason that the companies issuing them had not been doing business for a long enough period of time to know whether they were to be successful ventures, and to give their securities that sta-

bility which is requisite to make them proper investments for trust funds.

Trustee McDowell testified that he does not know what is meant by the term " seasoned " bonds. Nevertheless, I believe that the term is well recognized and advisedly used.

Some light is given on the subject of what the testator meant when he directed his trustees to invest and re-invest as they shall deem wise and judicious and for the best interest of the life beneficiaries, by examining the character of investments made by him, and which went into and formed the trust fund at its inception. *Duncklee* v. *Butler,* 30 Misc. Rep. 58, 59, 60. By going over the list we find it was composed of municipal bonds $85,500; Elmira Water Works Bonds (practically municipals) $14,000; light and water company bonds of corporations supplying cities $7,500; street railway bonds of companies operating in city streets $12,000; and steam railroad bonds $4,000. The testator evidently considered the wise and judicious way to invest money was in municipal bonds. The only municipal bonds invested in by the trustees were those of the city of Shawnee, Okla., which appear to have been bought on the recommendation of John G. McDowell, the life beneficiary. Out of the $123,000 of bonds left by the testator that went into the trust fund, there were no new interurban railway bonds, such as the Rochester, Syracuse and Eastern. There were no new lumber company bonds such as the Empire Lumber Company. There were no new land, water and orchard bonds, such as the Lewiston Land and Water Company. There were no new steam railroad bonds, such as the Gulf, Florida and Alabama Railroad Company. There were no new irrigation and land company bonds, such as the Sacramento Valley Irrigation Company. There were no new bonds of uncom-

pleted combination street and interurban railway company bonds such as the Birmingham, Ensley and Bessemer bonds. So that by no construction of the will, in the light of the surrounding circumstances, can it be said that the discretion given the trustees was intended *by the testator* to be broad enough to invest in new ventures. These investments may, some of them at least, be characterized as speculative for the reason that they bore the badge of speculation, namely, bonus stocks were given with the bonds. Such is almost never the case with seasoned securities, any more than it is with staple articles of commerce. It is always when some new article is brought out that a prize is given with it in order to induce the public to buy it. The article may prove to be all right and first class in time, but at the time it is first brought out no one can vouch for it from experience. So it may be with the securities in question, and it is claimed by the trustees that they are amply secured and will eventually return all that was paid for them, both principal and interest, but security alone does not make a bond a proper investment for trust funds; especially is this true in this case where the investments were to be made wisely and judiciously for the benefit of the beneficiaries. Securities that are amply secured but yield no income are not for the best interests of the beneficiaries.

On the hearing evidence was offered on the part of the trustees, in defense of the securities that have defaulted, that trustee McDowell had made considerable inquiry of different persons with reference to each of the different purchases, and that great reliance was placed upon the statements of agents selling the bonds and upon the reputation of the houses that such agents represented. I do not believe that it is the time spent in investigating securities that will make them

proper and legal investments for trust funds, and absolve the trustees from responsibility for the exercise of bad judgment. Neither do I believe it to be a safe thing to rely entirely upon the bond salesman's recommendation nor the reputation of the house he represents. There are other ways of ascertaining whether securities are seasoned, whether they have borne the stress of time and are good and reliable. The rule is very well stated in *Matter of Hall,* 164 N. Y. 199, 200, where the court said: " The range of so-called ' legal securities ' for the investment of trust funds is so narrow in this state that a testator may well be disposed to grant to his executors or trustees greater liberty in placing the funds of the estate. But such a discretion in the absence of words in the will giving greater authority should not be held to authorize investment of the fund in new, speculative or hazardous ventures. If the trustees had invested in the stock of a railroad, manufacturing, banking, or even business corporation, which, by its successful conduct for a long period of time, had achieved a standing in commercial circles and acquired the confidence of investors, their conduct would have been justified, although the investment proved unfortunate. But the distinction between such an investment and the one before us is very marked. Surely there is a mean between a government bond and the stock of an Alaska gold mine, and the fact that a trustee is not limited to the one does not authorize him to invest in the other."

As has already been stated, the securities in question were, in the language of the *Hall* case, new, speculative and hazardous ventures. They were not the securities of industries which, by their successful conduct for a long period of time, had achieved a standing in commercial circles.

My conclusion is that the trustees did not employ

Misc.] Surrogate's Court, Chemung County, January, 1918.

such vigilance, sagacity, diligence and prudence as, in general, prudent men of discretion and intelligence employ in like matters of their own affairs. In other words, I do not believe a vigilant, sagacious, diligent and prudent man, even under the discretion given the trustees in this will, would have invested $62,970 of trust funds in new ventures. I have made a diligent study of the very excellent brief of the counsel for the trustees and of the many cases cited therein, and I feel certain, under all the circumstances of the whole case, considering the investments held by the testator and the language of his will, that my conclusion, as stated, is correct. Especially is this true as to the voluntary investments in bonds of new concerns in foreign states, when no strong necessity or pressing emergency is shown therefor. *Ormiston* v. *Olcott,* 84 N. Y. 343.

As to the objection that the trustees did not act jointly in the purchase of securities and in the management of the trust estate generally, it will perhaps be well to refer to the evidence of each trustee to ascertain to what extent he participated and his co-trustees were consulted.

All three trustees testified that they knew they were acting as trustees. Trustee McDowell testified that he did not consult his co-trustees with reference to the purchase of the Lewiston Land and Water Company bonds. As to the Birmingham, Ensley and Bessemer bonds, he was not sure whether he consulted with his co-trustees with reference to their purchase. He also testified with reference to these bonds that he could not tell whether he would have purchased them if he *had known* the road was not in operation and that he didn't know whether it would be a good investment or not if the road were not in operation at the time of the purchase. He also testified that he knew that Poor's and

Moody's Manuals were the best publications, but couldn't tell whether he consulted them before or after the purchase of the bonds. The Sacramento Valley Irrigation Company bonds were purchased with the consent of his co-trustees. He had no recollection of consulting with his co-trustees with reference to the purchase of the Empire Lumber Company bonds. All the trustees took part in the purchase of the Rochester, Syracuse and Eastern bonds. With reference to the Gulf, Florida and Alabama Railroad Company bonds he doesn't testify that he consulted his co-trustees. Aside from the purchase of the Rochester, Syracuse and Eastern bonds, trustees Langdon and Decker seem to have no recollection of having taken part in the purchase of any bonds of the estate. Both these trustees knew that the Gulf, Florida and Alabama Railroad Company bonds were being offered for sale by an Elmira firm of brokers but they couldn't swear they were consulted with reference to their purchase for the trust estate. Mr. Langdon testified that all the work of the estate both as executor and trustee was done by Mr. McDowell except the actual countersigning of checks.

I think it fairly appears that all the investments were made by trustee McDowell. In none of the investments did either of the other trustees take the initiative. In the purchase of the Rochester, Syracuse and Eastern bonds alone did trustees Langdon and Decker take part. The funds of the estate were deposited in the bank in the name of " Estate of R. M. McDowell." The checks drawn on this deposit were signed by Mr. McDowell and had to be countersigned by one of the other trustees. Most of the checks that were drawn were for routine payments. In the matter of the exchange of certain securities for some of the new ones that have defaulted, it was not necessary to draw a

Misc.]    Surrogate's Court, Chemung County, January, 1918.

check.   It was only in those cases where there was something to be paid out on the transaction that one of the other trustees would be asked to countersign the check.

The account shows that the first investment made by the trustees was the purchase of the Rochester, Syracuse and Eastern bonds and the letter written by trustee McDowell to Mr. Fearey, bondsalesman, gives an idea of the attitude of Mr. McDowell, trustee, at the time of the making of this investment.

" *November 24th,* 1909.

" Mr. Thomas H. Fearey,
            " Canandaigua, N. Y.:

" My Dear Mr. Fearey:   I went out of town the latter part of last week and returned yesterday afternoon to find your communications here.

"After you left and when your letter from New York came *I took the matter up with the other trustees* and they seemed very cautious.   They gave me no answer one way or the other and when I went away they had not made up their minds what to do.

" *Today I have been studying the will and find that Uncle has given us trustees full power to invest the funds of the estate as we see fit using our own discretion,* leaving the whole matter in our hands.   *I think now that I can get the other trustees together and show them* that we have absolute power over the estate and that *there is no liability on our part for any errors in judgment and that they will consent to permit me to make this investment.*   If they do we will take the bonds.   *I will try and see them today* and let you know.

" In the meantime if you have sold the bonds it is all right.   I hope that my unavoidable delay has not caused you any inconvenience or disappointment.

            " Very respectfully yours,
                    " Boyd McDowell."

Surrogate's Court, Chemung County, January, 1918.   [Vol. 102.

In the letter Mr. McDowell states that after studying the will he finds that the trustees are given full power to invest the funds of the estate as they see fit and use their own discretion, leaving the whole matter in their hands. He then goes on to say he will *now* be able to *" show them,"* his co-trustees, that they have absolute power over the estate and that *" there is no liability on our part for any errors in judgment "* and that with that assurance he can obtain their consent to permit him to make the investment. His co-trustees were, however, disposed to be " very cautious " and they did not readily consent to the investment in these bonds. Mr. McDowell from his letter seems to have insisted on the purchase of these bonds and doubtless gave his co-trustees positive assurance that there was no liability in case of loss and that their powers under the will were practically unlimited. He is a lawyer. His co-trustees are not, and this assurance on his part doubtless accounts for his co-trustees thereafter paying so little attention to the matters of the estate. They were given to understand at about the date of this letter, when the matter of making the first investment came up, that there was no need of their being cautious and thereafter the whole matter was left to the judgment of Mr. McDowell alone, and from that time on practically everything concerning the investment of the funds of the estate and the management of it was left in his hands and to his judgment. This, of course, is contrary to the intention of the testator as appears by the terms of the will. The testator intended that the *three* trustees should act together in matters pertaining to the estate. If he had not so intended he would have named but one trustee. The law requires that the three trustees should act jointly in estate affairs except perhaps in purely ministerial matters. *Fritz* v. *City Trust Co.,* 72 App. Div. 532; Jessup-

Redfield, 571.  The will required that investments should be made as *they* (the trustees) deemed wise and judicious and not as *he* (McDowell, trustee) should deem wise and judicious.  The defect cannot be remedied by subsequent ratification.  The wrong has been worked. *Fritz* v. *City Trust Co., supra.* As stated, if the testator intended that only one trustee should have entire charge it would have been an easy matter for him to have left out the names of the other two and made one the sole trustee.  As it is, the management of the estate has been deprived of the judgment and counsel of two of the trustees and the investments, except the Rochester, Syracuse and Eastern and possibly the Sacramento Valley Irrigation Company bonds, are illegal for that reason also.

In further defense of the securities purchased by them, the trustees claim that John G. McDowell, at least, is estopped from disputing the validity of the investments.  Trustee Boyd McDowell testified that the sole reason for changing the securities in the estate was to increase the income to the beneficiaries, and that the beneficiaries wanted more income, and that John G. McDowell, at least, knew that some of the securities were being changed.  Trustee Decker testified that he knew that trustee McDowell was interested in increasing the income.  Both Boyd and John G. McDowell's testimony is that Boyd consulted with John G. about the investment in the Shawnee City bonds, and that John G. recommended them.  The same is true as to the Ontario Power bonds and the Youngstown and Ohio River Railroad Company bonds.  The note to No. 9 of Schedule C in the account filed by the trustees contains a statement that John G. McDowell advised the purchase of the Shawnee bonds.  Likewise, the note to No. 10 of Schedule C contains the statement that the Youngstown and Ohio River Railroad Company bonds

Surrogate's Court, Chemung County, January, 1918. [Vol. 102.

and the Ontario Power bonds were purchased with the full knowledge and approval of John G. McDowell. No objection is being made to these three bonds. They have ·not defaulted in their interest and all parties agree that they are first class securities, the Shawnees being municipals. In none of the notes set forth under any of the other bonds in the account is ,the statement made that John G. McDowell advised their purchase or that they were purchased with his knowledge. Neither trustee Decker nor trustee Langdon testified that any of them were purchased with John G. McDowell's knowledge or advice. Boyd McDowell testified that he did not remember consulting John G. McDowell with reference to the purchase of the Birmingham, Ensley and Bessemer bonds. He testified that he did not con-sult John G. McDowell with reference to the Empire Lumber Company bonds, nor the Birmingham, Ensley and Bessemer bonds. He testified that John G. McDowell knew of the purchase of the Rochester, Syra-cuse and Eastern bonds and the exchange of other bonds for the Rochester, Syracuse and Eastern bonds. At page 187, he testified that during the first year of the trust John G. McDowell knew of all of the trans-actions of the estate. The foregoing seems to be all the proof there is of the information that was given John G. McDowell by the trustees as to the invest-ments. Practically all of the defaulted bonds were purchased after the first year of the trust, and it is only claimed that John G. McDowell knew about the transactions during the first year, and, aside from the positive denial by John G. that he knew anything of these investments, I do not think the proof goes far enough to fasten on him any responsibility for their purchase or to relieve the trustees from any .liability they may have incurred. Furthermore, it is undis-puted that early in the management of the estate it was

agreed between Boyd McDowell and John G. McDowell that, although the latter was a bond salesman, he should have nothing to do with the sale of securities to the estate. To hold John G. McDowell responsible for the investments that were made by the trustees would be to substitute him in the place and stead of the trustees. I think that it is reasonable to assume that if the testator had wanted his son as one of the trustees he would have named him as such in his will. Counsel for the trustees states in his brief " The chief object of this trust fund was to provide for the support of his son John. He did not directly leave his son a single cent."

The rule of estoppel, which the trustees seek to invoke against the beneficiaries, is a harsh one and should never be applied unless the case falls within the well defined rule as stated in the head note to *Adair* v. *Brimmer,* 74 N. Y. 539, as follows: "Also held, that to establish a ratification by the *cestui que trust,* in such a case, the ratification must not only be clearly proved, but it must be shown that it was made with full knowledge of all the material facts, and also that the *cestui que trust* was fully apprised of their effect and of his or her legal rights in the premises."

The beneficiaries also object to the commissions claimed by the trustees for receiving and disbursing the income. The total income of all three trusts, during nine years, is $47,566.97. The will directs that $1,000 be set aside as the McDowell Cemetery trust fund. This has been done. The will also directs that the income of $10,000 be paid to Elizabeth R. Boyd during her lifetime, and the evidence given on the former proceeding shows that a trust fund of $10,000 has been established for Miss Boyd. The income during the nine years on the McDowell Cemetery fund has been $383.15. Of this amount $239.24 has been dis-

bursed, leaving a balance of $143.91 in the hands of the trustees to the credit of that fund. The principal of this fund not amounting to $100,000, the trustees are entitled to one set of commissions to be deducted from the amount on hand. It appears by the account that all of the income received on the Elizabeth Boyd trust fund has been paid over to her, so that there is nothing in the hands of the trustees from which commissions can be deducted. They may, therefore, be deemed to have waived their commissions for having received and disbursed the sum of $3,831.46, income of that fund. After deducting the amounts received and disbursed on the Miss Boyd and the Cemetery trust funds, amounting to $4,214.61, there is a balance of $43,352.36 that has been received as income on account of the residuary trust fund, provided by the will, payable to John G. McDowell and Clara McDowell, the objecting beneficiaries, all of which has not been disbursed. The trustees claim over $4,000 commissions on this fund. They arrive at this amount by computing the commissions on the receipts and disbursements in each year during the continuance of the trust, the same as though there had been an annual settlement at the end of each year. However, the account shows that during each year, except the years 1916 and 1917, all of the income was disbursed and no commissions deducted. By computing the commissions in the manner claimed by the trustees, they come to more than double the amount that they would if computed on the whole sum accounted for on this accounting. Commissions are allowed for services. Code Civ. Pro. § 2753. The making of an account, whether to the court for judicial settlement or direct to the beneficiaries, is a part of the service required for which commissions are allowed. Section 2753 of the Code also provides: " If an executor, acting as trustee, or if a trustee or guardian, is

required to receive income and pay over the same, and such executor, trustee or guardian pays over said income and *renders an annual account* to the beneficiary of all his receipts and disbursements on account thereof, he shall be allowed, and may retain, the same commission on the amount so accounted for as he would be allowed upon principal on a judicial settlement; if he does not render such annual account, he shall be allowed, upon his judicial settlement, his commissions upon the *total income* from any money or property then payable to such beneficiary.''

It will be noted that if the trustee renders an annual account to the beneficiary of all his receipts and disbursements he shall be allowed, and may retain, his commissions the same as he would be allowed upon a *judicial settlement,* but if he does not render such *annual* account he shall be allowed upon his judicial settlement his commissions upon the *total income.* In other words, the intent of the section seems to be, that if nine separate accounts had been made, that is, one in each year during the continuance of the trust, the trustees would have been entitled to nine separate sets of commissions, one each year, which they might have had by taking them out of the amount received, but, if they have failed to make these separate accounts and make only one account, as in this case, they are entitled to one set of commissions computed on the whole amount received and disbursed. The legislature seems to have intended to allow full commissions on each accounting. If there has been only one accounting, they are entitled to commissions on the amount accounted for. If they account for the receipts and disbursements only once in one lump sum, the commissions should be computed on that sum, and not on nine different sums. The principal of the fund being more than $100,000, each trustee is entitled to one full set of commissions computed in

Surrogate's Court, Chemung County, January, 1918. [Vol. 102.

this manner, amounting to $623.52, or $1,870.56 for the three, which are allowed, to be paid as hereinafter provided for.

This being, under section 2723 of the Code of Civil Procedure, a judicial settlement, commissions may also be allowed for receiving the *corpus* of the trust fund, and shall be paid as hereinafter provided for.

The matter of the credit taken by the trustees of $1,185 for payments made to Grace Brown for clerical services, as follows: in the year 1909, $150; in the year 1910, $225; in the year 1911, $160; in the year 1913, $650, was disallowed on the former accounting. On that accounting also, the traveling expenses incurred by Boyd McDowell in looking up defaulted securities, amounting to $457.25, were allowed and directed to be paid out of the *corpus* of the funds. These matters have been heretofore decided by this court, and that part of the decision has been affirmed by the Appellate Division (178 App. Div. 248) in the following language: "All the persons beneficially interested are before the court. The accounts filed by the executors are for their proceedings as executors and as trustees, and those accounts have been examined and passed upon." These matters are, therefore, not properly before the court. The income account of the trustees should be surcharged with the amount of the Grace Brown claim and the Boyd McDowell expense claim; and the expense claim should be charged against the *corpus* of the estate.

The trustees should be charged with the amount paid by them for the securities that have defaulted, together with interest on the several sums paid for the different bonds, from the date of the last payment of interest on these bonds, less any amount that has been received by them on account thereof.

It having been held herein that the amount of the principal and income of the estate having been depleted

by the making of unlawful investments by the trustees, it would not be fair or equitable to further reduce this principal and income by allowing the trustees commissions to be deducted at this time. The decree to be entered hereon should direct that the trustees reimburse the estate for the amount of the unlawful investments, within one year from the entry thereof, at which time the trustees' commissions may be computed and allowed as decided herein.

A decree should be prepared and entered in accordance with this decision.

Decreed accordingly.