## Heyl's Estate.

Argued April 22, 1938. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Robert T. McCracken,* with him *Sheldon F. Potter* and *Joseph Carson,* for appellants.

*John Wintersteen,* of *Wintersteen, McCoy & Wintersteen,* with him *Harry J. Alker, Jr.,* and *W. Richardson Blair,* for appellees.

OPINION BY MR. JUSTICE SCHAFFER, June 30, 1938:

Appellants, who are beneficiaries of this trust estate, seek to surcharge the trustees, because they invested moneys of the trust in (1) a mortgage on property which does not yield an income, (2) in a mortgage on property which does not yield sufficient income to meet taxes on the property and the interest on the mortgage, (3) in an overdue mortgage, the term of which has not been extended, without first having the real estate reappraised to ascertain its value. The learned Orphans' Court declined to make any surcharge.

The broad proposition stated in appellants' brief is that a mortgage secured upon real estate, producing no income, or income insufficient to meet taxes and interest on the mortgage, is not a proper investment of trust moneys. If we should affirm this proposition, and announce it as a rule of law, one thing we think is reason-

ably sure to happen, there would be further havoc added to that now financially existing, because it would upset financial investment customs which have existed throughout the Commonwealth for generations. It would call in question mortgage loans made on farms occupied by the owners, on homes occupied by the owners, on all new buildings where income had not yet been realized, and would, to a large degree, stop real estate development. Income from the properties mortgaged would not have been taken into account in many, if not all, of these instances by the persons making the loan, for the reason that this is not the way mortgage loans have been made. They have been negotiated on a percentage of the market value of the property securing them. It has been thought, with foresight and wisdom, based upon the safest of all guides, experience, that the best assurance that a mortgage would be paid, principal and interest, was to be found in the estimated sale price above the amount of the mortgage, that a mortgagor, having an equity of one third or more in the property, would be spurred to payment by his stake therein. Indeed as between the equity in and income from a property, there can be little comparison so far as security to a mortgagee is concerned. The mortgagor can divert the income and put it to uses other than the payment of interest to his mortgagee, but he cannot divert the equity.

Income from real property, and by this is largely meant rents, is far from being the best criterion of value. We think it is within the experience of every lawyer, who has had to deal with real estate matters, that temporary income from some properties, be it much or little, does not point the way to true intrinsic value. Some properties, under temporary conditions, will produce large income, some none. In bad times, farms may add nothing to their owners' assets, in good years much, but the test in the minds of wise investors is what would the farm sell for in average times. Not only has the test

of security for money lent on mortgage by trustees and by all other sound investors lending their own funds been the intrinsic value of the property, not its income, but no better guide to safety of principal can be found. "Be sure your principal is safe" was the maxim of a wise- and far-seeing financier. That should be the first thought and the guiding signboard for all who invest other peoples' funds. It is not even suggested in this case that at the times the loans were made the trustees did not have full reason to think the intrinsic values of the properties warranted them.

Let us look at the mortgages here in question. One was secured on a dwelling owned and occupied by the mortgagor, a doctor, as his residence. The property was appraised by two competent appraisers at $85,000, four years before the investment was made. It was assessed at $76,000. The mortgage was for $35,000, less than fifty per cent of the appraisement. The portion taken in this estate was $10,000. While the mortgage was over-due when the trustees invested in it, in the sense that the term of the loan as set forth in the mortgage had expired, no default had taken place. Two of the mortgages were upon central Philadelphia business properties. One of them was appraised at $749,000 and the mortgage was for $350,000, again less than fifty per cent of the appraisement. This estate's portion was $10,000. The other was appraised at $333,756, the mortgage was for $165,000, a little less than fifty per cent of the appraisement, and this estate's portion $10,000. Another was upon one of the outstanding real estate developments in the "Main Line" suburban section adjacent to Philadelphia, improved with sewers, gas, water, electricity, paving and curbing, appraised by three competent appraisers at $427,200. The amount of the mortgage was $215,000, slightly more than fifty per cent of the appraisement. This estate's portion was $10,000, which has been reduced by payments to $942.58. Another was upon the property of the Melrose Country

Club containing 154½ acres, improved with a modern concrete clubhouse and a golf course. The Club paid $710,000 for the property in 1926. The property was appraised at $700,000, the mortgage was for $225,000, and this estate's portion $5,000. The last of the mortgages was upon a property appraised at $65,000, situate in the Borough of Lansdowne, well located, and operated by the owners, who lived on the premises, as an apartment boarding house and dining room. The mortgage was for $30,000, again less than fifty per cent of the appraisement. The estate holds the entire amount of the mortgage.

We think it can be safely stated that no one would have been considered an imprudent investor who had placed his money in any of these mortgages, at the time these trustees did so, before the financial crash, under the showing established by the valuations. In the stipulation of facts, placed upon the record and before the court below, signed by attorneys for all parties concerned, it is stipulated that the appraiser who in each instance made the appraisement for the trustees and who was employed by the corporate trustee, "was especially familiar with real estate values." It is easy now, in view of the happenings to values in the past eight years to conclude that the appraisements placed upon the properties are too high, measured by today's market price, but no one had the prescience and judgment at the time these loans were made to forecast the conditions which exist today.

On behalf of appellants it is stated that the principle advanced by them has been affirmatively determined in a number of cases, including cases decided by the English courts. An analysis of the cases referred to fails to substantiate this statement. In the case of *Stickney v. Sewell*, 1 My. & Cr. 8, 40 Eng. Rep. 280, the sole question for determination was whether the value of the property mortgaged warranted the investment. After determining that it did not, the court in support of its position

pointed to the fact that the rent from the property had decreased from £180 to £70 the year following the investment. In *Macleod v. Annesley,* 16 Beav. 600, 51 Eng. Rep. 912, the loan was made by the trustees on the security of a mortgage on a head rent leasehold, with covenant for perpetual renewal upon payment of a peppercorn, sublet by the mortgagor, and the court considered the rentals received from the property, they being of course the only indicia of value. In *Shaw v. Cates,* [1909], 1 Ch. 389, and *Palmer v. Emerson,* [1911], 1 Ch. 758, the sole attack on the investments was made on the ground that the value of the property did not warrant the mortgage investment. They lend no support to appellants' position. In fact, in *Shaw v. Cates,* the rule was not observed, at least as applied to new houses. The only English case referred to which might be considered as tending to support appellants' position is the early case of *Ingle v. Partridge,* [1865], 34 Beav. 411, 55 Eng. Rep. 694. A careful reading of the opinion in that case leads to the thought that what really was in the mind of the court in making the surcharge was the lack of value in the property on which the loan was made.

The American cases cited, likewise, fail to aid appellants in the controversy. *Kimball v. Reding,* 31 N. H. 352, involved an investment in the stock of a contemplated railroad having no income. *Garesche v. Priest,* 9 Mo. App. 270, affd. 78 Mo. 126, merely holds that an administrator cannot invest funds of the estate without court permission. In *Adair v. Brimmer,* 74 N. Y. 539, the investment was in the bonds of a mismanaged coal company earning no money with which to pay the interest, the bonds being secured by a mortgage on property worth considerably less than the amount of the mortgage. A similar situation was presented in *In re McDowell,* 102 Misc. 275, 169 N. Y. S. 853, where the trustees invested in bonds of corporations engaged in new and untried ventures and having no income. *In re Jenkins' Est.,* 260 Mich. 518, 245 N. W. 508; *Durant v.*

*Crowley,* 197 App. Div. 540, 189 N. Y. S. 385, affd. 234 N. Y. 581; *Roach's Est.,* 50 Ore. 179, 92 Pac. 118; and *In re Jones' Est.,* 155 Misc. 315, 280 N. Y. S. 521, a surcharge was sustained on the ground that the security, was not of sufficient value to warrant the investment.

The broad, general principle governing trustees in the investment of trust money we have declared many times. "All that is required of a trustee 'is common skill, common prudence and common caution, and he is not liable when he acts in good faith as others do with their own property . . . a trustee will not be held personally liable for an honest exercise of a discretionary power, in the absence of supine negligence or wilful default'": *Dempster's Est.,* 308 Pa. 153, 159, 162 A. 447. The propriety of an investment must be judged as it appeared at the time it was made and not as viewed in the light of subsequent events: *Wood's Est.,* 272 Pa. 8, 12, 115 A. 865; *Detre's Est.,* 273 Pa. 341, 349, 117 A. 54. At the time these investments were made, the Fiduciaries Act of June 7, 1917, P. L. 447, Sec. 41, contained the simple and unqualified provision that fiduciaries might invest in "mortgages or ground rents in this Commonwealth." To this was added the provision of the Act of April 26, 1929, P. L. 817, Sec. 1, 20 PS Sec. 801, that mortgages thereafter taken should not exceed two-thirds of the fair value of such real estate. Section 41(a) 3, since amended, 20 PS Sec. 805, of the Fiduciaries Act provided: "In case the said moneys shall be invested as set forth in paragraph one of this clause, . . . the said fiduciary shall be exempted from all liability for loss on the same, in like manner as if such investments had been made in pursuance of directions in the will creating the trust, it being hereby declared that the investments mentioned in this section are legal investments of moneys by fiduciaries."

We conclude that nothing brought to our attention would warrant the surcharge of the trustees.

Decree affirmed at appellants' cost.