## Crane's Estate.

Argued January 5, 1941. Before Schaffer, C. J.; Maxey, Drew, Linn, Stern, Patterson and Parker, JJ.

*Robert W. Archbald, Jr.,* of *Archbald & Busser,* for appellants.

*Joseph J. Brown* and *John Wintersteen,* of *Wintersteen & Williams,* with them *W. Richardson Blair, John Arthur Brown, D. Alexander Wieland* and *George C. Denniston,* for appellee.

*Joseph G. Denny, Jr.,* for appellees.

*William Carson Bodine* and *Thomas Stokes,* of *Pepper, Bodine, Stokes & Schoch,* and *C. H. Latta, Jr.,* of *MacCoy, Brittain, Evans & Lewis,* and *Boyd Lee Spahr,* of *Ballard, Spahr, Andrews & Ingersoll,* for appellees, filed a brief under Rule 61.

OPINION BY MR. JUSTICE LINN, January 20, 1942:

These appeals bring up a question raised by exceptions to the adjudication of five accounts of testamentary trustees under the will of Theron I. Crane, who died November 2, 1929. The accounts were filed in consequence of the death in 1938 of testator's widow, one of the three trustees. Five appeals are by a guardian and trustee ad litem and two by a beneficiary. Appellants contend that the Girard Trust Company, the corporate co-trustee, was negligent in investing trust funds in participations in a certain mortgage and that there was error in refusing to surcharge. As we all agree that the evidence would not support a surcharge, it is unnecessary to deal with other points.

We take the following statement concerning the mortgage from appellants' history of the case: "On November 4, 1929, Girard Trust Company, as trustee for sundry trusts, took a mortgage of $2,500,000 on what will be designated as the Penfield property, namely, property on the west side of Juniper Street, Philadelphia, extending from Chestnut Street to Sansom Street, being 125 feet on Chestnut Street, improved with an old-fashioned

office building and some stores and the Garrick Theatre. The property had been appraised by W. A. Brandt, an appraiser employed by the Girard Trust Company for the purpose of the loan at $5,000,000. This was ground value, without placing any material value on the buildings. It was known to the appraiser and the officers at the time the loan was made, that the property did not produce enough to pay mortgage interest after taxes. The net income for 1928, after payment of taxes, was $135,220.25, not quite sufficient to pay $150,000 interest at 5% on the loan. For 1929 (the year during which the loan was taken) the net income, after payment of taxes, was $121,774.59. In 1930, the net income, after paying taxes, was $76,336.80. This was the last full year before the investment in question was made. In 1931, the net income, after paying taxes, was $31,609.39.

"The owner of the property, whose bond accompanied the mortgage, was Mrs. Anne W. Penfield, who then had the reputation of being a very rich woman, able to pay the interest, and the Girard Trust Company, in taking the loan, took this fact into consideration.

"No complaint is made that the loan was not prudent at the time it was made. . . ."

The quotation may be interrupted to note that on October 19, 1931, five certificates of participation (total $20,800) in this mortgage were allotted to the five trusts and March 22, 1932, the investments in each of three of the trusts were increased by $1,000. Appellants' statement continues: "All the investments of October, 1931, were purchased from the agency account of a man named Calkins for whom Girard Trust Company acted as agent in making investments and collection of interest on the same. All the purchases of March, 1932, were made from an account carried by the Girard Trust Company as a temporary depository of various trust funds.

"At the time this investment was made, no written appraisal of the Penfield property was made by anyone, and none had been made since the mortgage was first

placed. On December 14, 1934, three years after the investment, Brandt valued the property at $3,500,000. No formal appraisal, written or otherwise, was made by anyone in the sense that any person ascertain[ed] the present relevant facts with regard to the property, and with these facts before him, deliberately determined a valuation of a certain amount for mortgage purposes. The mortgage was not then in default; taxes and mortgage interest had been paid as required by the mortgage.

"Mrs. Penfield died February 25, 1932, before the investments of March, 1932. Claim on her bond was filed by Girard Trust Company with her executors March 19, 1932, a few days before the March investments were made. The last payment on account of interest was in November, 1933. . . .

"After making claim on the bond, the Girard Trust Company, together with the Philadelphia Saving Fund Society, who together held all Mrs. Penfield's mortgage bonds, obtained from the executors an additional mortgage on all the unencumbered real estate in the County of Philadelphia owned by her, in order to carry on the lien of decedent's debts which would have expired after one year. The properties so mortgaged were then, and have ever since been unproductive, so that the mortgagee has got nothing out of them, and has not cared to foreclose, thereby avoiding personal liability for taxes.

"Early in 1933, it appeared that Mrs. Penfield's personal estate would be insufficient to pay her obligations. Girard Trust Company, however, did not foreclose on the Penfield property for various good and sufficient reasons. They were getting all the rents applied to the purposes of the property as it was. . . . They secured the demolition of the Garrick Theatre building and increased revenue by making a parking lot and by other improvements.

"Finally, the mortgage was foreclosed, and the property was purchased by the Girard Trust Company at Sheriff's Sale December 5, 1938, at $2,400,000. The de-

ficiency judgment against Mrs. Penfield's other estate was eventually established at $964,247.41. None of this has been collected. The Girard Trust Company is now in possession, managing the property.

"No complaint is made of the way in which Girard Trust Company has handled this mortgage since the default occurred. . . ."

Whether the accountants complied with the rule of due care[1] by investing part of the Crane trust funds in participations in the Penfield mortgage in 1931 and 1932 must be determined in the light of the facts existing when the investments were made.[2]

Appellants attempt to support their averment of negligence on two grounds: (1) that no appraisements of the security were made immediately before the participations were taken; and (2) that although the value of the land had not depreciated from what it was at the date of the mortgage, November, 1929, there was no market for it when these trust funds were invested.

Section 41[3] of the Fiduciaries' Act of June 7, 1917, P. L. 447, 508, as amended, provides for investment of trust funds and, inter alia, authorizes investment in what have long been known as real[4] securities as distinguished from personal securities. Since the Act of April 6, 1925, P. L. 152,[5] investments in certificates of participation in mortgages of real estate securing bonds have become familiar and, in various aspects,[6] have been

---

[1] *Jones' Estate*, 344 Pa. 100, and cases there cited.

[2] *Heyl's Estate*, 331 Pa. 202, 208, 200 A. 617; *Saeger Estates*, 340 Pa. 73, 75, 16 A. 2d 19.

[3] For the prior law, see Report of Commission to Codify and Revise the Law of Decedents' Estates, p. 204.

[4] See *Hemphill's Appeal*, 18 Pa. 303, 305; *Attorney General v. Bowles*, 3 Atk. 806, 26 Eng. Rep. 1260 (1754); *Maroney's Estate*, 311 Pa. 336, 339, 166 A. 914; *Curran's Estate*, 312 Pa. 416, 167 A. 597.

[5] Now superseded by the Acts of May 5, 1933, P. L. 364, 15 PS section 2852, and May 15, 1933, P. L. 624, 7 PS section 819.

[6] *Guthrie's Estate*, 320 Pa. 530, 182 A. 248; *Rambo's Estate*, 327 Pa. 258, 193 A. 1; *Harton's Estate*, 331 Pa. 507, 1 A. 2d 292.

considered by the courts. The Act of April 26, 1929, P. L. 817, 20 PS §801, amending the Fiduciaries' Act, and effective when the Crane funds were invested, authorized investment in "first mortgages on real estate in this Commonwealth, securing bonds or other obligations not exceeding in amount two-thirds of the fair value of such real estate; . . . or in bonds, payable not more than twenty years after date, of one or more individuals, secured by a deed or deeds of unencumbered real estate in this Commonwealth conveyed to a corporation organized under the laws of this Commonwealth and authorized to act as trustee, in trust for the benefit of all such bondholders, but the total amount of any such bond issue shall not exceed two-thirds of the fair value of the real estate securing it, and the trustee shall not be exempted, by contract or otherwise, from responsibility for performing the ordinary duties of trustees; or in trust certificates, issued by a trust company organized under the laws of this Commonwealth, certifying that the holders thereof are respectively the owners of undivided interests in deposits, with such trust company, of securities in which trust funds may be invested under the preceding provisions of this clause: . . . Within the meaning of this clause, the 'fair value' of real estate shall be the value placed thereon, in writing, by a reputable person, who shall be especially familiar with real estate values, shall have actually inspected the real estate before making his valuation, and shall certify that his valuation was made after inspection of the premises."

In considering whether the failure to re-appraise in October, 1931, and again in March, 1932, was evidence of negligent administration, it may first be noted that such re-appraisement was not then required by statute. The legislature subsequently dealt with a phase of re-appraisement in section 1, subsection (7) of the Act of June 24, 1939, P. L. 718, providing that in the case of investment in mortgage-pools maintained by trust depart-

ments of banks and trust companies, "no new appraisement of the assets contained in such fund shall be required at the date of such investment, provided such assets are appraised at least once every three years."[7] Without applying that provision retrospectively, the fact that a three-year interval between appraisements has received legislative approval, is significant in any consideration of the prudence of accountant's conduct in making the investment without first having the security re-appraised. The mere failure to obtain re-appraisements is not evidence of negligence when considered, as it must be, with the other circumstances appearing in this record.[8]

The controlling evidence is not in dispute. As the court found that the loan to Mrs. Penfield in November, 1929, was a prudent investment, it must likewise be re-

---

[7] Concerning fractional investments in individual mortgage obligations the following provision is made: ". . . if the date of such investment is subsequent to the original date of such mortgage or to the date of any renewal or extension of such mortgage, such investment being made by purchase, assignment, or otherwise, no new appraisement shall be necessary to fix the fair value, at the date of such investment, of the real estate subject to such mortgage: Provided, That such an appraisement, as is provided herein, has been made within three years from the date of such investment, and a reputable person, familiar with real estate values in the vicinity of such property and also familiar with such previous appraisement, shall certify in writing that, at the date of such investment, the face amount of the bond or other obligation secured by such mortgage does not exceed two thirds of the fair value of such property. Any such certificate shall be filed and preserved among the records of the fiduciary."

On appraisement in general, subsection 19 (d) of the same section provides: "(d) Within the meaning of this section, the term 'fair value' of real estate shall be the value placed thereon in a written appraisement by two reputable persons, familiar with real estate value in the vicinity of such real estate, who shall actually have inspected the property before making the appraisement and shall so certify therein. Any such appraisement shall be filed and preserved among the records of the fiduciary."

[8] Compare *Saeger Estates*, 340 Pa. 73, 16 A. 2d 19; *Swindell's Estate*, 332 Pa. 161, 3 A. 2d 2.

garded as conceded that if participations had then been allotted to the Crane trusts such investments would have been good. The next inquiry is: What change occurred in the security between November, 1929, and October, 1931, or March, 1932, making what would have been a lawful investment for trust funds in 1929 unlawful at the subsequent dates? There is no proof that the fair value of the security was less in 1931 or 1932 than it was in 1929.[9] The fact that the income was not sufficient to pay interest and carrying charges did not make these investments imprudent.[10] Nor may negligence be inferred from the fact that the Trust Company took into account Mrs. Penfield's bond accompanying the mortgage; considering the fair value fixed by the appraiser, the bond was an additional security.[11] The record shows that this property had and retained peculiar and unusual elements of value. The adjudication contains a long statement of fact on the subject, part of which may be quoted: "This mortgage was the largest held by Girard Trust Company. It was familiar to all the officers, and particularly to those charged with mortgage investments. The property was just around the corner from the Girard Trust Company's offices, and it was the largest piece of real estate under one ownership in the heart of the city of Philadelphia, on the best part of the best shopping street.

"Mr. Daniel L. Cullen, Chief of the Real Estate Department of Girard Trust Company, testified that the

[9] The learned auditing judge found as a fact that ". . . while between October, 1929, and October, 1931, there had been a very great financial upheaval, yet central real estate had not yet been affected, and was not affected until late in 1932."

[10] Compare *Heyl's Estate*, 331 Pa. 202, 200 A. 617 (affirming 29 Pa. D. & C. 672), where the subject of mortgage investment on the security of land, as distinguished from the security of the income returned by the land, was dealt with by the present Chief Justice, who, as is well known, had wide experience at the Bar in advising with respect to such transactions.

[11] *Maroney's Estate*, 311 Pa. 336, 339, 166 A. 914.

Penfield property 'was the most desirable in the center of Philadelphia, because it was the largest piece, you might say, of unimproved real estate, because it was generally known that the buildings were more or less old, and eventually that property would be used for the construction of a very large building. It has always been our thought, and still is, that to assemble a piece of ground of that size today would be impossible in the center city, in our opinion.' The original appraisement represented ground. value. 'No value was given to the building whatsoever, because, as I understand it, it was contemplated the real value of this property would depend on improvement and development. . . . I did not give very much, if any, consideration to rentals.' "

The legislature, in authorizing trust fund investments in real securities, prescribed a limited relation between loan and security; it defined the trustee's duty which must be taken to have been performed if the Act was complied with. It provided: "Within the meaning of this clause, the 'fair value' of real estate shall be the value placed thereon, in writing, by a reputable person, who shall be especially familiar with real estate values, shall have actually inspected the real estate before making his valuation, and shall certify that his valuation was made after inspection of the premises."[12] Both parties and the learned judges who heard the case below agree that the mortgage, made in November, 1929, was within the terms of the Act. It is a fact in the case that the "fair value of the real estate" mortgaged was $5,-000,000; presumably, as there is no evidence to support a contrary finding, the fair value remained the same in 1931 and 1932. It is therefore immaterial, on the negligence issue, that no re-appraisement was made before the investments. At the argument, counsel proposed a comparison of markets for real estate with markets for personal property sold on exchanges, or over the counter.

---

[12] Act of April 26, 1929, P. L. 817, section 1, 20 PS section 801.

Both the constitution, Article III, section 22, and section 41 of the Fiduciaries' Act, as amended, 20 PS §801, differentiate, for trust fund investments, between real securities and personal securities. When the legislature authorized investment in real securities, it was cognizant of the difference between the two classes; we must therefore assume that when it specified a fractional part of the "fair value of real estate" as a test for trust investments, it intended to recognize that conversion of mortgaged real estate into cash differed in many respects from the forced sale of personal property, and that an essential difference between the two lay in the difficulty, during periods of extraordinary depression, of obtaining an immediate buyer for real estate as compared with the sale of freely marketable personal securities. As the record shows the trustees complied with the statute, they cannot be surcharged merely because, in 1931 and 1932, they misjudged, if they did misjudge, what the future effect of the financial depression would be on their ability quickly to sell the mortgaged land for a price which a prudent man in like circumstances should consider reasonable. If, when default occurred, there was in such sense no immediate market for this land, that contingency must be regarded as having been in legislative contemplation as one that might possibly occur; but for that very reason, the fact that it occurred, cannot be considered evidence of negligence in this case. We need not attempt, once for all, to define the phrase "fair value of real estate," as used in the statute. It would not aid, in the decision of the case, now to consider separately the definitions of the word "value" as affected by different adjectives suggested in the argument; value is a word used in many senses as different contexts[13] show; a discussion of the distinctions may be laid aside because it is sufficient, for present purposes, to say that fair value, as

[13] See Bonbright: Valuation of Property (1937), Volumes I and II, passim, particularly pp. 66-97, 122-125, 1171-1173.

152

used in the statute, means the price which buyers of the class who would be interested in buying such property would be justified in paying for it; we need not attempt to specify the elements to be considered in arriving at the "fair value" because the parties agree that $5,000,000 was the fair value; presumably it remained so when the investments were made.[14]

Concerning the taking of mortgage participations from another account of the corporate trustee and allotting them to the trusts here involved, it is sufficient to say that appellants concede the applicability of *Saeger Estates,* 340 Pa. 73, 16 A. 2d 19, and that we find no evidence that would support a surcharge for this reason.

Orders affirmed; costs to be paid out of principal.

---

[14] See Note 9, supra.