# Austin et al. v. City Stores Company (No. 1)

*Edmonds, Obermayer & Rebmann,* for plaintiffs.

*Sundheim, Folz, Kamsler & Goodis* and *Wolf, Block, Schorr & Solis-Cohen,* for defendant.

ALESSANDRONI, J., November 28, 1953.—These proceedings were instituted under the provisions of the Act of May 5, 1933, P. L. 364, sec. 908, 15 PS §2852-908, as amended, providing for the appraisal at "fair value" of the dissenting shares to a corporate merger. The shares which refuse to assent to the merger must be appraised at their "fair value" as of the day prior

to the date of the vote on the merger. At issue here are 12,760 dissenting shares of Lit Brothers, which has since merged with City Stores.

The voting day was February 20, 1951, hence the shares must be appraised as of February 19, 1951. The appraisal must be made without any consideration to any appreciation or depreciation, if any, resulting from the merger. We are therefore concerned with the "fair value" as of the above date. Petitioners perfected the proceedings necessary for the appointment of three distinterested appraisers. Hearings were held and an extensive record was compiled. The appraisers awarded a value of $16.50 per share and in accordance with the statute have submitted their award to the court for determination. Exceptions to the award of the appraisers were filed and duly argued by both the dissenting shareholders and the surviving corporation.

Before turning to a consideration of the record made before the appraisers, and their award, a statement of general principles and the law governing the case will assist our determination. To begin with, we believe it is obvious that the term "fair value" is an elastic one and subject to an infinite number of variations in definition and in the component elements that combine to establish the "fair value" of anything: Crane's Estate, 344 Pa. 141. The very elasticity of the phrase is underscored and emphasized by the differences in the testimony of eminent experts in security analysis made during the lengthy proceedings now before the court for determination.

Another pertinent observation deals with the weight of value judgments in matters of this type. No mathematical computation or arithmetic value can be ascribed to any particular element that when added to others may properly be said to constitute the fair value of any given security. Hence, we must consider

all the essential elements that might affect the security at issue and arrive at a conclusion based on such consideration.

Some of the factors that must be considered in rendering an intelligent decision are: Asset value; market value; market prices of comparable companies; market price and earnings ratio; management and its policies; earnings; dividends; valuation of assets; reserves for various contingencies; tax liabilities; future earnings; predictions of future business events, and etc. The list seems interminable, and yet all factors must be considered and given their proper weight in order that a just result might be attained.

We must define the term "fair value" in its present context, so that we may know what it is that we seek. That is to say, what is to be valued? Generally speaking the dissenting shareholder is being forced to give up his share of a going concern. However, it must be noted that the pressure is not to be presumed to be an invidious one; the shareholder has made his decision not to accept the terms of the merger. Another facet of this issue is the corporation's interest to the extent that the assenting shareholders might very well suffer if the corporation is ordered to pay a grossly unjust amount for the shares of the dissenters. Corporate assets would thereby be depleted pro tanto. Thus, the term fair value must encompass the rights of all the parties, and the dissenters are entitled to no more than that of which they are deprived. They should not be paid a premium based on any settlement value or upon any foresight that they might have exercised. Their shares are worth no more than those of the assenting shareholders. All that the dissenters are entitled to is the "intrinsic value" of their shares.

At first blush this would appear to be a case of first impression in Pennsylvania. However, while the language "fair value" as used in the Act of 1933 has

never been construed in Pennsylvania with reference to shares of corporate stock, the construction of similar if not identical language of other statutes by the Supreme Court offers an excellent guide. The Act of April 26, 1929, P. L. 817, 20 PS §801, which amended the Fiduciaries Act of June 7, 1917, P. L. 447, authorized investment in mortgages on real estate not exceeding two thirds of the fair value of such real estate. "Fair value" was the value to be placed thereon by one especially familiar with real estate values. The court, in Crane's Estate, 344 Pa. 141, refused to define "fair value of real estate" as used in the statute. For that purpose it was sufficient "to say that fair value used in the statute, means the price which buyers of the class who would be interested in buying such property would be justified in paying for it".

In Market Street National Bank et al. v. Huff et al., 319 Pa. 286, 287, the court held that "fair value at the time of sale" under the Deficiency Judgments Act of January 17, 1934, P. L. 243, was the market value at the time of the sale as fixed by men competent and qualified to express an opinion; "not a surmise based on a future which no man can possibly forecast, and upon facts imagined and not now existing. There can be no other fair value except fair market value."

In Vollmer et al. v. Philadelphia, 350 Pa. 223 "actual value" as used in an assessment statute was declared to mean market value, under conditions which were not those of a forced sale. In Kaemmerling's Appeal, 282 Pa. 78, the court said, at page 82, in construing a statute requiring assessments at "actual value thereof", "actual value limited and defined by market value".

The latest pronouncement of the court is enlightening. In Moffett Estate, 369 Pa. 159, the court had before it a statute which required property for tax purposes to be appraised at "clear value." Shares of

stock of a closely held corporation were appraised for State inheritance taxes. The court refused to limit the meaning of "clear value" to either market or asset value, but said that "clear value" was the "estimated net worth" of the taxable property. The court then explained why neither book nor market value considered alone were enough to establish "clear value" of the shares.

Book value, earnings, dividends, sales of shares, financial policy of management, etc., must be considered. Also, the court indicated, at page 163, that no one element is controlling for the reasons therein stated. That is to say, while stock which is freely sold on an exchange might have its value established there, it does not follow that it has to in every case; asset values can be misleading depending upon method of carrying the assets on the books; earnings and dividends depend on many variables and hence are unreliable guides in and of themselves. A vigorous dissent by Mr. Justice Bell was registered for market value as the clear value, where the market is such that it is free of infirmity or of any element that might indicate the absence of a free market.

Mr. Justice Bell there stated, at page 169, that price times earnings ratio and yield are two of the most important factors in determining market value. However, the majority opinion defined "clear value" as the estimated net worth. It would appear that defining "fair value" as the intrinsic value of the business is equivalent to the court's definition of "clear value".

One important conclusion follows from both the majority and minority opinions in Moffett Estate, supra, to wit, that no one factor in and of itself is determinative. Therefore, all of the elements that combine to constitute a going concern must be considered in an appraisal.

Counsel have cited cases from other jurisdictions dealing with similar appraisals as that now under consideration. Of course, each jurisdiction is concerned with the appraisal under the language of its statute. The New York statute uses "value". Delaware also uses "value". However, both of the above jurisdictions have concluded that all factors must be considered in the appraisal of shares: Tri-Continental Corp. v. Battye et al., 74 A. 2d 71 (Delaware, 1950); Application of Marcus, 79 N. Y. S. 2d 76, affirmed 303 N. Y. 711.

The court in Application of Marcus, supra, after stating that market price was controlling if set in a market which indicated a fair reflection of the judgment of the buying and selling public, also said, at page 81: "This does not mean that the appraisers are confined to market value or must accept market value as the value of this stock." This position is in accord with the opinion of the Supreme Court as expressed in Moffett Estate, supra. We deem it unnecessary to consider cases from other jurisdictions any further, because despite the lack of construction of this particular statute, there are sufficient guides from the Supreme Court to chart the inquiry and determination that must be made.

It is submitted that our Supreme Court has delimited the meaning of value in similar situations with sufficient clarity so as to make possible the rendering of an equitable conclusion. It remains now for us to use the principles set forth as our compass and to apply the foregoing principles and guides to the facts.

We turn now to consider the position of the parties as they argue the factor of the market price of the shares as (1) merely a factor to be weighed, or (2) a controlling factor. Petitioners argue that market price is merely an element and then proceed to explain it away; respondents assert that it is a controlling

factor, and would permit consideration of other factors, but in reality they rest on market price as *the* controlling element. Petitioners went to great lengths to consider market price out of any consideration at all. Finely spun arguments are used to accomplish this objective. Respondents, on the other hand, have argued that absent an infirmity in the market, market price is controlling. The net result is that under their theory a mere look at the market is sufficient to warrant the conclusion that market price is the "fair value". Neither position is tenable in view of the holding in Moffett Estate, supra.

At the very least, market price must be, if obtained in an open market of sufficient breadth and volume, a very significant factor. Absent evidence of an infirmity in the market, the price there established merits considerable weight. Therefore, in order to avoid any consideration of the effect of the market price on the value of the shares in this proceeding, there must be a showing of an infirmity in the market. In Application of Marcus, 79 N. Y. S. 2d 76 and in Application of Silverman, 122 N. Y. S. 2d 312, the court said, at pp. 316, 317:

"Market value has been the controlling consideration where there is a free and open market on a recognized stock exchange and the volume of transactions and conditions make it a fair reflection of the judgment of the buying and selling public."

In the Matter of Silverman the court listed several factors which rendered the above principle inapplicable in that case, namely:

1. The shares were not listed on any exchange.

2. The recognition of the marked difference in the reliability of the market as a guide between the over-the-counter market and an established stock exchange.

3. The over-the-counter market is not subject to the same regulation and control as a recognized exchange.

4. The record of prices is difficult, if not impossible to obtain, because of "bid-asked" system, with a corresponding wide spread between "bid" and "asked".

In this case, the shares of Lits were bought and sold on the then New York Curb Exchange, now the American Stock Exchange. A record of its prices is available from the date first listed, as is also a record of the volume traded. Despite this, petitioners have pointed to two factors which they assert constitute reason for ignoring the market price as a factor to be considered.

These two factors are: (1) A low dividend pay-out, deliberately calculated to depress the market, and (2) sale of 7,000 shares by Bankers Securities in January 1951 to prevent an increase in the market price of Lit Brothers shares. Bankers Securities Company is the parent of City Stores, and City Stores then held a majority of Lit Brothers. We turn first to consider the dividend pay-out's effect on the market price and petitioners' assertion that the dividend policy was deliberately calculated with the knowledge of its effect on the market price.

Petitioners' position is that the dividend pay-out has a direct effect on the market price of shares. Therefore, they assert, deliberately withholding a fair dividend unnaturally prevents the shares involved from reaching a fair market price. They cite as an illustration the reversal of the prices of shares of the Reading Railroad and the Pennsylvania Railroad when the position of their respective dividends as to amount were altered. However, we can test this theory by considering City Stores and the dividend effect on the selling price of its shares.

At the time of this merger, City Stores was selling for $21, approximately 12 times earnings. In January 1951 the dividend rate was increased from $1.20 to $1.40 per year. Hence upon the basis of the effect of

the dividend on market price, City Stores' shares should have gone up in price, yet in April 1952 it was obvious that City Stores was only selling for approximately $15. Certainly, this testimony was admissible to test the assumptions and conclusions of petitioners' experts.

No one can deny that regardless of profit, the needs of the business for money for expansion, etc., are of primary concern in paying a dividend and deciding what dividend to pay. Therefore, let us now consider Lit Brothers' dividend policies, and the considerations that led to the decision as to the amount of dividends to be paid.

Dividend no 1 on common stock was paid on October 10, 1931; dividend no. 2 was not paid until July 30, 1948, a period of almost 17 years. Thereafter, Lit Brothers paid a semi-annual dividend of 25 cents. During the period January 31, 1946, and beginning in July 1948 to January 31, 1951, Lit Brothers paid to its common shareholders a total dividend of $3. In that period Lit Brothers also retired all of its preferred shares and the dividends in arrears on the preferred. A subordinated debenture was substituted for the preferred.

Likewise, during the same five-year period, Lit Brothers underwent a tremendous expansion, both in plant and in sales volume. Consequently its cash balance was considerably reduced; this reduction amounted to almost $4,000,000. Certain assets were disposed of; Lit Brothers realized a profit on the sale of a building and its ownership of a radio station. Inventory accounting was altered to the L.I.F.O. system, that is, the last in—first out, instead of the market or cost type of inventory accounting. Cyclical billing was also installed, which had the initial effect of decreasing collections. Installment accounts also blossomed.

The testimony of the chairman of the board of Lit Brothers was to the effect that the dividend was very liberal when all of the factors that a board must take into account in setting a dividend, were considered. Especially when the business was expanding as rapidly as it did during this period, a considerable amount of funds were retained to provide the necessary capital. Significantly, nowhere is there any criticism of the management of the business; on the contrary, it was highly commended. There is no record of any complaint regarding averments of unfair treatment of minority shareholders. We must conclude from these facts that the policy of dividend payments was not one deliberately calculated to depress the market.

One additional factor was the continual rise of the selling price of Lit Brothers shares despite the unchanged dividend. That is to say, in 1948, the low was $7\frac{1}{8}$, the high was 11; in 1949, the low was $6\frac{1}{2}$, the high $11\frac{1}{2}$; 1950, the low was $9\frac{1}{2}$, the high, $13\frac{1}{4}$. If petitioners' experts are correct, then the market of Lit Brothers shares failed to conform to the dividend pay-out percentage as a direct instrument to depress the market. Despite identical dividends in 1949 and 1950, the market price rose from a low of $6\frac{1}{2}$ in 1949 to a low of $9\frac{1}{2}$ in 1950. The figures are a very strong indication of other facts and circumstances affecting market price.

Natelson's position, an expert for respondents, was that earnings as such are not the most important factor in valuing a security, but rather the amount of the dividend that the company can pay under its own financial circumstances. Therefore, it is at once obvious that the common shares of Lit Brothers could expect no dividends until the arrearages on preferred were paid. His figures indicate that including both the retirement of preferred shares with dividends in arrears, and dividends on common, Lit Brothers paid

out 60 percent of its earnings. Included in this earning figure was the sales profit on a building and a radio station.

His analysis deals with the dividends the company can pay and the dividends it is likely to pay. His position more nearly reflects the needs of the business in ascertaining the effect of dividends on the fair value of shares, rather than the somewhat doctrinaire approach outlined above. This explanation seriously weakens the charge of deliberately paying a low dividend to depress the market.

We pass now to the effect of the sales by Bankers Securities Company in the period immediately preceding the merger. Pursuant to Securities and Exchange Commission Regulation A, Bankers Securities Corporation filed a letter of notification of its intention to sell 7,500 shares of Lit Brothers common. After such notification, the sale of 7,000 was instituted beginning January 6, 1951, through to January 11, 1951. On January 13, 1951, the SEC was notified of the withdrawal of the offer of 500 shares included in the above letter of notification.

This information is significant for several reasons: First, because of the control of Lit Brothers by Bankers Securities Corporation through City Stores. Secondly, the price of Lit Brothers common was not depressed by the sales, nor is there any evidence that its purpose was to depress the shares. The sales by Bankers Securities Corporation ranged between 13⅜ to 14½. On January 11, 1951, the last sale for the day, not by Bankers Securities, was 14.

The prices obtained for Lit Brothers common stock during the period January 1, 1951-February 20, 1951, are significant on the charge of deliberate rigging of the market by Bankers Securities Corporation. The high for the period was 14⅞ on February 6, 1951, and the low was 12½ on January 3, 1951. The low

for the period in February was 13⅝. During the month of January 21,000 shares were traded; in February, 37,700. It must be noted that Bankers Securities Corporation withdrew from the market on January 11, 1951, when it sold 500 shares; also that the market continued its rise after Bankers Securities withdrew. It is obvious from just a casual reading of the market quotations above set forth, that the market was not rigged; that the shares found their proper level in a free and open market of considerable volume.

Graham, one of petitioners' experts, purchased 2,000 shares on January 10th, and 1,000 shares on January 25, 1951. The range on January 10, 1951 was 13-13¾; on January 25, 1951, the range was 13¼-13½. Despite the purchases made by Graham after the announcement of the proposed merger, he now states that the shares he himself purchased were not purchased in a free market. He has testified that the fair value of his shares, purchased between the ranges indicated, was $24 a share, a bare month after purchase. The interest of Graham in the above-appraised figure has diluted the force of his testimony.

We must conclude that the record does not establish any infirmity in the market. Nor would we be justified in concluding that market price standing alone is the controlling factor. However, we agree that it may very well be considered a major factor, and probably should be when the record indicates the existence of an open market with a sufficient volume of trade to establish a price agreeable to both willing buyers and sellers.

Petitioners after discarding market price placed their major emphasis on a market price-earnings ratio to establish the fair value at $24 per share. This ratio is expressed as an arithmetic multiplier to be applied to earnings to determine the fair value. Lit Brothers'

average earnings were $2.80 per share; the shares were selling at an average price of $14; the multiplier would therefore be obtained by dividing earnings into price, and its use in the future would be to multiply earnings.

Now, in order to utilize this multiplier in estimating the fair value of the share at issue, the multiplier remains constant and the fair value results from applying the multiplier to an estimate of future earnings. Hedberg estimated the future earnings at $2.50 per share for the years 1952, 1953. He then applied a multiplier of 9-9½; with 9, the value was $22.50; with 9½, the value was $23.75. Hedberg's multiplier was larger than any one of the 11 companies he used for comparison with Lit Brothers, and of the Strudley-Shupert group of companies, only one had a multiplier as high as 9½. Hedberg's reasons for his selection of 9-9½ are as follows: (1) Lit Brothers' record and management are excellent; (2) prospects for Philadelphia seem to be above average; (3) use of L.I.F.O. inventory account lowered Lit Brothers' earnings; (4) the financial situation of Lit Brothers. Here, as must be apparent, the multiplier is based on several factors which can only be determined by value judgments. We do not have before us sufficient evidence to evaluate the companies chosen by Hedberg. It is only his judgment that has chosen this figure. Yet, as will be shown, his estimate on the future profit of Lit Brothers was off by over $500,000.

Graham used a 5-7 year future average of $2.25 per year. He used a "normal" multiplier of 12, and his conclusion was $27 per share. However, he reduced this figure to $24 because he anticipated that Lit Brothers' dividend pay-out would be a little less than the two-thirds figure he considered to be normal. It does not seem realistic nor compatible with proper business practice to set a percentage as a normal divi-

dend pay-out. The estimate of Graham of future profits was in error by $250,000 for 1952.

In connection with Graham's conclusion the following statement is most enlightening. He said:

". . . I think every analyst is aware of the fact that stocks have been selling for years for normally low multiple[s] of their actual earnings; the figures of 6, 7, 8, and 9 times earnings which are derived from these calculations are extraordinarily low multiples when they are related to long-term experience and new theoretical values of earnings." Hedberg also explained away the low multipliers on much the same basis.

Such a statement certainly affords little aid in assisting the court in arriving at a fair determination. It may very well be that theoretically all multipliers are abnormally low, but we are concerned only with the facts. No convincing explanation has been offered for adopting the multiplier of 12 as the normal one, aside from the bare statement cited above and the additional testimony that it was a "normal multiplier."

The explanation for the failure of the market to reflect fair value is said to be the low dividend policy. Yet, there is no evidence that minority shareholders ever indicated their displeasure over the dividend policy, or management. Despite high praise for management, which of course includes the board, the action of the board as to dividends is attacked. We cannot impeach past decisions of the board which seem to be compatible with sound business practice and for which there were compelling reasons. We must either take petitioners' testimony as to the excellence of the management at their face value or else consider the statements to be damning management with faint praise. Apart from the alleged reason for the failure of the market to reflect fair value, i.e., the low divi-

dend rate, petitioners have not charged management with misconduct.

Testimony was offered by both sides, and was admitted over the objections of both, of events that occurred after February 19, 1951. We think such testimony was admissible to test the assumptions and estimates made by their respective experts. The earnings of Lit Brothers for 1952 were somewhat under $2,000,000. If we apply the multipliers of both Hedberg and Graham, we get $18 and $19 for Hedberg, and $24 for Graham, which must be adjusted downward for a less than two-thirds dividend pay-out. Both estimates of future profits were in error as has already been stated. There is no reason why the court should not take advantage of the actual facts to test the conclusions of the experts. Therefore, the actual facts have revealed a fatal variance with the estimates.

We turn now to consider the comparisons made with other companies. In all, some 33 companies of various types were compared. With few exceptions, the experts failed to agree as to which were suitable for comparison. In the face of such lack of unanimity, this particular field offers little concrete ground for exploration. Our attempt to reconcile the position of the experts on the companies that should be used for comparison would be futile.

It should be obvious that any comparison would be the equivalent of using analogies with all the inherent faults of analogies, to wit, different facts. Hence, at the most it would be useful as but a guide. The court is unable to say as a matter of law or fact which of the 31—the other two are Lit Brothers and City Stores —are more nearly alike and hence a useful means of comparison. There is this to be said, however, that Hedberg's and Graham's multipliers are larger than the average of those compared.

Another factor to be considered is asset value with emphasis on the effect thereof on the fair value of a going concern. Assets in this context are useful only to the extent that they are able to generate earnings. It is not unusual for shares to sell for less than book value. It would appear that such a market relationship is merely a short method of indicating that if all the assets were liquidated the book value could never be realized. Of course, the real value of the assets is that they are combined to form a "going concern". Hence, asset value, in and of itself, offers little with regard to fair value, unless asset and market value are grossly out of line.

However, petitioners did attempt to so adjust the asset value of Lit Brothers as to establish the fact that asset value was grossly out of line with market value. The adjustments concerned the following items to which petitioners took exception: Doubtful accounts reserve; the insurance coverage in excess of book value on the real estate; an excess provision for taxes; the profit hidden by the change to the L.I.F.O. method of inventory accounting, and the trading stamps reserves.

The total of the adjustments adds approximately $3 to the book value of each common share; that is from approximately $18.50 to $21.50. However, the experts also admitted that the items were proper and in accord with sound accounting practice; but, that for the purposes of this appraisal the book value ought to be adjusted. After it is so adjusted, and comparing it with the purchase by Lit Brothers of Swern and Company at 113 percent of book value, the same percentage gives a rough approximation of a value of $24 per share.

If this be true, that is, that the accounting practices of Lit Brothers were in accord with sound, and conservative accounting principles, then petitioners should be precluded from making these adjustments. The

doubtful accounts reserve is said to be excessive by $600,000; but petitioners have to admit that it is sound accounting to have a sizeable reserve on accounts receivable totaling $14,000,000. The accountant for Lit Brothers explained that the reserves were established on the basis of cyclical fluctuations in business and the economy.

That is to say that at any given point of time, if an attempt to liquidate all receivables was made, depending on the phase of the business cycle, the reserve might be either too large or too small. In a period of prosperity the need is less; in a depressed period, the reserve would probably prove to be less than that needed. The above is merely an example of the type of attack made, despite many commendations as to sound accounting principles.

Considering that asset value as such offers little help in appraising the fair value of the shares, we are not inclined to accept the additions. Petitioners cannot carry water on both shoulders. It is either good accounting or bad, but it cannot be said to be good for one purpose and improper for appraisal purposes. Nor have they established that the asset value is so far out of line as to reflect the situation in the market price.

Petitioners, having instituted this action, have the burden of establishing the "fair value" of their shares. In the absence of an infirmity in the market, the price openly arrived at in accordance with recognized trading practices in securities, is a major consideration. A free market price merits more than just passing consideration. We are unwilling to concede that it is the controlling factor for several reasons.

When one is attempting to evaluate the "intrinsic value of the entire business" one should and must have the opportunity of examining all the facts. If market price were *the controlling factor*, the appraisal

would consist of merely examining the market price and market practices to determine whether or not an infirmity existed therein. A proper evaluation requires more than that: Moffett Estate, supra. If the legislature wanted market price to control, they would have said so, hence the fact that they did not has added significance.

In an appraisal of stock value, judgments play a heavy role. Fair value is nothing more than an abstract, which for practical reasons must be reduced to an arithmetic figure. Hence, if we start with market price as a major factor and taking all other factors into consideration, market price would seem to be at the least a starting point. No precise formula can be stated. Nor can a value be set for each factor. Considering all the testimony, all the exhibits, the calibre and experience of the experts, the facts adduced to test the various assumptions, we think petitioners failed to carry their burden.

But, by the same reasoning, we do not feel that respondents have sustained their position, that market price alone is controlling. Under the decisions previously cited it is apparent that the Supreme Court has declared against respondents.

We have carefully considered the record, and its exhibits; we have had the benefit of extensive and well prepared briefs submitted by counsel for all concerned; and the appraisers, well qualified, have given us the benefit of their experience and consideration. Their award should be and is entitled to great weight. They have carefully considered all of the factors which when combined constitute the "fair value" of the shares. After reviewing all of the above, we conclude that the exceptions to the appraisers' award filed by both petitioners and respondents have not been sustained and should be dismissed.

*Order*

And now, to wit, November 28, 1953, petitioners' and respondents' exceptions to the award of the appraisers are dismissed; the award of the appraisers of $16.50 is confirmed.

Costs are to be paid by City Stores.